**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM FAIRHURST,
　　　　　　*Plaintiff-Appellant,*

　　　　　v.

JEFF HAGENER, Director, Montana
Department of Fish, Wildlife &
Parks,

　　　　　　*Defendant-Appellee.*

No. 04-35366

D.C. No.
CV-03-00067-SEH

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
August 3, 2005—Seattle, Washington

Filed September 8, 2005

Before: David R. Thompson, Thomas G. Nelson, and
Kim McLane Wardlaw, Circuit Judges.

Per Curiam Opinion

12673

## COUNSEL

Alan L. Joscelyn, Gough, Shanahan, Johnson & Waterman, Helena, Montana, for the appellant.

Rebecca J. Dockter, Montana Department of Fish, Wildlife & Parks, Helena, Montana, for the appellee.

## OPINION

PER CURIAM:

William Fairhurst appeals the district court's grant of summary judgment in favor of Jeff Hagener, director of the Mon-

tana Department of Fish, Wildlife and Parks ("Department"). We hold that a pesticide applied to a river pursuant to an intentional scheme aimed at eliminating pestilent fish species is not a "pollutant" for the purposes of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, and thus not subject to the Act's permit requirements. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court.

## I. BACKGROUND

Hagener initiated a ten year program known as the Cherry Creek Native Fish Introduction Project ("Cherry Creek Project"), in which the Department sought to re-introduce a threatened fish species called the westslope cutthroat trout. Because this species was threatened in part by competition with other non-native trout species, Hagener's program included a plan to remove the non-native fish. The Department would apply the pesticide antimycin into the water for short periods of time over the course of several years and afterwards reintroduce the westslope cutthroat. As the Department began executing the project, it performed at least one application of antimycin to Cherry Creek.

Fairhurst sued Hagener under the citizen suit provision of the CWA. Fairhurst claimed that in order to legally disperse pesticide into United States waters, Hagener was required by the CWA to obtain a National Pollutant Discharge Elimination System ("NPDES") permit, which Hagener had not secured before applying the antimycin. The parties stipulated that the Department applied the antimycin in accordance with the requirements of the label approved by the Environmental Protection Agency ("EPA") pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136(y). The parties further stipulated that the Cherry Creek Project "went according to the plan which included application of Antimycin directly to the waters of the U.S. . . . Consequently, the species killed were rainbow and Yellowstone cutthroat trout." Fairhurst sued for an injunction

proscribing all future unpermitted applications of the antimycin.

Fairhurst and Hagener each moved for summary judgment. The district court granted Hagener's motion and denied Fairhurst's on March 24, 2004. Fairhurst timely appeals here.

## II.   STATUTORY FRAMEWORK

The Clean Water Act requires that a government agency obtain a NPDES permit before discharging any pollutant from any point source into navigable waters of the United States. 33 U.S.C. § 1323(a). The NPDES permit system "allows a polluter who obtains a permit to discharge a specified amount of the pollutant." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 530 (9th Cir. 2001) (citing 33 U.S.C. § 1342). "Absent the required permit, such discharge is unlawful." *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002). The NPDES program allows the EPA to "issue permits on a case-by-case basis, taking into account local environmental conditions." *Headwaters*, 243 F.3d at 530 (citing *Am. Mining Cong. v. United States Envtl. Prot. Agency*, 965 F.2d 759, 762 n.3 (9th Cir. 1992)). Further, Congress has given "the Governor of each State desiring to administer its own permit program" permission to do so, provided that the EPA Administrator approves the Governor's program. 33 U.S.C. § 1342(b). When the state permit program is in force, the federal permit program is suspended. *See* 33 U.S.C. § 1342(c).

[1] The CWA defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). "Pollutant," in turn, means

> dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials,

heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

33 U.S.C. § 1362(6).

## III. DISCUSSION

The parties have stipulated that "Cherry Lake and Cherry Creek and its tributaries are all navigable waters or waters of the United States for purposes [of] the . . . Clean Water Act." Moreover, the parties do not dispute that the discharge of antimycin was an "addition" from a "point source." Nor do they dispute that Hagener did not seek or obtain a NPDES permit from the Federal or State NPDES program. The crux of the parties' disagreement is whether the antimycin as applied to Cherry Creek should be characterized as "chemical waste," and thus whether it falls under the CWA's definition of "pollutant" in 33 U.S.C. § 1362(6), rendering its unpermitted application illegal under the Act. Hagener also argues that if the antimycin is a "pollutant," its use in accordance with its FIFRA label eliminates the requirement that he also obtain a NPDES permit.

### A. "Chemical Waste"

We consider whether a pesticide applied directly and intentionally to United States waters for the purpose of eliminating pests is a "chemical waste" for the purposes of 33 U.S.C. § 1362(6), when such application is carried out in accordance with an EPA-approved FIFRA label, and when the pesticide performs as intended. We review issues of statutory interpretation de novo. *Res. Invs., Inc. v. U.S. Army Corps of Eng'rs*, 151 F.3d 1162, 1165 (9th Cir. 1998).

In *Headwaters*, 243 F.3d at 526, we were presented with a similar question. In that case we considered whether the herbicide Magnacide H, applied to irrigation canals "for a benefi-

cial purpose, the clearing of weeds," was a "chemical waste" for the purposes of 33 U.S.C. § 1362(6). *Id.* at 532. We noted that acrolein, the active ingredient in Magnacide H, is "a toxic chemical that is lethal to fish . . . which takes at least several days to break down into a nontoxic state." *Id.* We also noted in passing that "it would seem absurd to conclude that a toxic chemical directly poured into water is not a pollutant," *id.* at 532-33, although we declined to decide the question whether the intentionally applied and properly functioning portions of acrolein were "chemical wastes." Answering this question was unnecessary because "the *residual* acrolein left in the water after its application qualifies as a chemical waste product and thus as a 'pollutant' under the CWA." *Id.* at 533 (emphasis added). We therefore found that the CWA required an entity desiring to dispense a chemical that leaves residue into the waters to obtain a NPDES permit for discharge, even when the chemical bears a FIFRA label.

**[2]** Unlike *Headwaters*, this case squarely presents the issue whether pesticide intentionally applied directly into the water in accordance with all applicable requirements of FIFRA should be characterized as "chemical waste." Here the parties do not assert that there was residual chemical left in the water after the antimycin had performed its intended purpose. On the contrary, as the district court noted, "it is unchallenged that following application, the antimycin dissipated rapidly" and left no residue. Fairhurst again conceded as much at oral argument.

**[3]** Because the factual scenario presented here differs from *Headwaters*', and there is no other controlling circuit law on the meaning of the term "chemical waste," we next look to the plain meaning of the statutory term. In *Northern Plains Resource Council v. Fidelity Exploration & Development Co.*, 325 F.3d 1155 (9th Cir. 2003), we defined "waste" as "any useless or worthless byproduct of a process or the like; refuse or excess material." *Id.* at 1161 (citing Am. Heritage Dictionary 672 (1979)). Merriam-Webster's definition is in the

same vein: "damaged, defective, or superfluous material produced by a manufacturing process." *See* Merriam-Webster online, www.merriam-webster.com. Because the parties stipulated that the antimycin was applied and functioned as intended, it was not "damaged" or "defective." Moreover, the parties do not claim that any portion of the pesticide applied to the water was "superfluous material" or "refuse or excess material." A plain meaning analysis of the phrase "chemical waste" thus suggests that a pesticide that is intentionally applied to the water and leaves no excess portions after performing its intended purpose is not a "chemical waste."

**[4]** This analysis accords with the EPA's construction of the CWA's definition of "chemical waste" in the context of intentionally applied pesticides. In July, 2003 the EPA issued a memorandum entitled "Interim Statement and Guidance on Application of Pesticides to Waters of the United States in Compliance with FIFRA" ("Interim Statement") to address this issue. Available at http://www.epa.gov/npdes/pubs/pesticide_interim_guidance.pdf.[1] The Interim Statement asserts that the "EPA has evaluated whether pesticides applied consistent with FIFRA fall within any of the terms in section 506(2) [defining the term 'pollutant'], in particular whether they are 'chemical wastes' or 'biological materials.' EPA has concluded that they do not fall within either term." *Id.*

**[5]** The EPA's Interim Statement is entitled to some deference. In *Resource Investments, Inc.*, 151 F.3d at 1165, this court held that "an agency's construction of a statute it is charged with enforcing is normally entitled to deference if it

---

[1] In February 2005, the EPA issued an "Interpretive Statement and Notice of Proposed Rulemaking on the Application of Pesticides to Waters of the United States in Compliance with FIFRA" ("Interpretive Statement"). 70 Fed. 3d Reg. 5093 (Feb. 1, 2005). While the Interpretive Statement has now superceded the Interim Statement, the Interpretive Statement mirrors the language and analysis of the Interim Statement, which was in effect at the time the dispute arose and the district court considered the case.

is reasonable and not in conflict with the expressed intent of Congress." *See also League of Wilderness Defenders*, 309 F.3d at 1189 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), for the proposition that the discretion the courts should afford to an agency interpretation of a statute "will depend on the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control").

**[6]** The Interim Statement arrives at its conclusion by first analyzing the plain meaning of the term "waste," and finding that "[p]esticides applied consistent with FIFRA are not such wastes; on the contrary, they are EPA-evaluated products designed, purchased and applied to perform their intended purpose of controlling target organisms in the environment." The Statement then asserts that its interpretation comports with the intent of Congress by pointing out that the interpretation—which entails that pesticides are "pollutants" in some circumstances and not in others—tracks the understanding of the primary sponsor of the CWA, who stated that "[s]ometimes a particular kind of matter is a pollutant in one circumstance, and not in another." *Id.* (quoting Senate Debate on S. 2770, 117 Cong. Rec. 38,838 (daily ed. Nov. 2, 1971) (Statement of Senator Muskie)).[2] Finally, the Statement notes that pesticides are not "waste," for CWA purposes, only when they are applied in a manner consistent with an EPA-approved FIFRA label. *Id.*

**[7]** We find the EPA interpretation as articulated in the Interim Statement "reasonable and not in conflict with the expressed intent of Congress." *Res. Invs, Inc.*, 151 F.3d at 1165. The interpretation also accords with the plain meaning of the term "chemical waste." Moreover, the EPA interpreta-

---

[2]Senator Muskie also stated that "defining or applying these definitions to particular kinds of pollutants . . . is an administrative decision to be made by the Administrator." *Id.*

tion does not conflict with *Headwaters*, as in that case the "chemical waste" for which a NPDES permit was required was not a pesticide serving a beneficial purpose and intentionally applied to the water, but was a chemical that remained in the water after the Magnacide H performed its intended, beneficial function. Therefore, we conclude that pesticides that are applied to water for a beneficial purpose and in compliance with FIFRA, and that produce no residue or unintended effects, are not "chemical wastes," and thus are not "pollutants" regulated by the CWA. Because intentionally applied and properly performing pesticides are not "pollutants," a potential discharger is not required to secure a NPDES permit for such pesticides before discharge.

The parties stipulated that the antimycin was applied intentionally and in a manner that comported with the EPA-approved FIFRA label. Moreover, the parties do not claim that the antimycin had any unintended effects, or that any residue from the antimycin remained after the pesticide performed its intended function. Thus, we hold that the CWA did not require Hagener to secure a NPDES permit.

## B.    FIFRA

Because we have held that the antimycin applied to the Cherry Creek drainage during the Cherry Creek Project is not a chemical waste, and thus not a pollutant for the purposes of the CWA, we do not address Hagener's argument that he was not required to obtain a permit because he was in compliance with the requirements of FIFRA.[3] We do note, however, that this argument is explicitly foreclosed by *Headwaters*. *See Headwaters*, 243 F.3d at 531-32.

---

[3]Nor do we address Hagener's contention that his pesticide dispersal is exempted from the NPDES permit requirement because the department "applied for and received a short-term exemption from water quality standards from the Montana Department of Environmental Quality (DEQ)."

The district court expended considerable effort attempting to "give effect to each" of the two statutes in question here, the CWA and FIFRA, citing *Headwaters*' statement that "[t]he CWA and FIFRA have different, although complementary, purposes." *Headwaters*, 243 F.3d at 531. However, *Headwaters* explicitly held that "registration and labeling . . . under FIFRA does not preclude the need for a permit under the CWA." *Id.* at 532. On the contrary, *Headwaters* noted that "[e]ven [a] cursory review of the statutes reveals that a FIFRA label and a NPDES permit serve different purposes":

> FIFRA establishes a nationally uniform labeling system to regulate pesticide use, but does not establish a system for granting permits for individual applications of herbicides. The CWA establishes national effluent standards to regulate the discharge of all pollutants into the waters of the United States, but also establishes a permit program that allows, under certain circumstances, individual discharges. FIFRA's labels are the same nationwide, and so the statute does not and cannot consider local environmental conditions. By contrast, the NPDES program under the CWA does just that. . . . The NPDES permit requirement under the CWA thus provides the local monitoring that FIFRA does not.

*Id.* at 531.

As *Headwaters* explained, FIFRA is a labeling statute that informs the user of a pesticide how to safely use it. FIFRA regulates solely through its registration requirement, and its prohibition against the sale, distribution, and professional use of unregistered pesticides. 7 U.S.C. §§ 136a(a), 136j(a)(1). The statutory scheme puts the onus on manufacturers and distributors to draft and secure approval of the FIFRA label before placing their products on the market. There is no statutory enforcement mechanism governing usage of FIFRA products according to the label. The CWA, by contrast, regu-

lates the amount and type of pollutants dispersed into the waters of the United States. The NPDES requirement allows the EPA to consider "local environmental conditions," and issue permits for "individual discharges." *Headwaters*, 243 F.3d at 531. *Headwaters* accordingly held that a person who disperses a "pollutant" as defined by 33 U.S.C. § 1362(6) must secure a NPDES permit, regardless of whether or not the pollutant is dispersed according to instructions on the FIFRA label. *Headwaters* is not disturbed by our holding today; here we address dispersal of a pesticide that is not a chemical waste and thus not a pollutant.

## IV.   CONCLUSION

**[8]** A chemical pesticide applied intentionally, in accordance with a FIFRA label, and with no residue or unintended effect is not "waste" and thus not a "pollutant" for the purposes of the Clean Water Act. Because Hagener's application of antimycin to Cherry Creek was intentional, FIFRA-compliant, and without residue or unintended effect, the discharged chemical was not a "pollutant" and Hagener was not required to obtain a NPDES permit.

**AFFIRMED.**