*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0004p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THE NATIONAL COTTON COUNCIL OF
AMERICA, et al.,

                         *Petitioners,*

      *v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

                        *Respondent.*

Nos. 06-4630; 07-3180/
3181/3182/3183/3184/3185/
3186/3187/3191/3236

On Petition for Review of Final Action of the

United States Environmental Protection Agency.

Nos. OW-2003-0063; 40 CFR Part 122.

Argued: April 29, 2008

Decided and Filed: January 7, 2009

Before: GUY, SUHRHEINRICH, and COLE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charles Tebbutt, WESTERN ENVIRONMENTAL LAW CENTER, Eugene, Oregon, for Petitioners. Alan D. Greenberg, UNITED STATES DEPARTMENT OF JUSTICE, Denver, Colorado, for Respondent. Claudia M. O'Brien, LATHAM & WATKINS, Washington, D.C., Kirsten L. Nathanson, CROWELL & MORING, Washington, D.C., for Intervenors. **ON BRIEF:** Charles Tebbutt, WESTERN ENVIRONMENTAL LAW CENTER, Eugene, Oregon, Lauren E. Brown, WATERKEEPER ALLIANCE, Irvington, New York, Daniel E. Estrin, PACE ENVIRONMENTAL LITIGATION CLINIC, White Plains, New York, Reed W. Super, MORNINGSIDE HEIGHTS LEGAL SERVICES, INC., COLUMBIA UNIVERSITY SCHOOL OF LAW, New York, New York, Charles C. Caldart, NATIONAL ENVIRONMENTAL LAW CENTER, Seattle, Washington, Steven Schatzow, LAW

OFFICES OF STEVEN SCHATZOW, Washington, D.C., for Petitioners. Alan D. Greenberg, UNITED STATES DEPARTMENT OF JUSTICE, Denver, Colorado, for Respondent. Claudia M. O'Brien, Kenneth W. Weinstein, Davis B. Tyner, LATHAM & WATKINS, Washington, D.C., Kirsten L. Nathanson, Ellen Steen, CROWELL & MORING, Washington, D.C., for Intervenors. Elliot Silverman, McDORMOTT WILL & EMERY LLP, Irvine, California, for Amicus Curiae.

_____

**OPINION**

_____

COLE, Circuit Judge. These proceedings involve a final regulation issued by the Environmental Protection Agency (the "EPA") under the Clean Water Act, 33 U.S.C. § 1251 et seq. The Clean Water Act regulates the discharge of "pollutants" into the nation's waters by, among other things, requiring entities that emit "pollutants" to obtain a National Pollutant Discharge Elimination System ("NPDES") permit. *Id.* §§ 1311(a), 1342. On November 27, 2007, the EPA issued a Final Rule concluding that pesticides applied in accordance with the Federal Insecticide, Fungicide, and Rodenticide Act (the "FIFRA") are exempt from the Clean Water Act's permitting requirements. *See* 71 Fed. Reg. 68,483 (Nov. 27, 2006) (the "Final Rule"). Two different groups of Petitioners—one representing environmental interest groups and the other representing industry interest groups—oppose the EPA's Final Rule as exceeding the EPA's interpretive authority. The EPA defends the Final Rule by arguing that the terms of the Clean Water Act are ambiguous and that the Final Rule is a reasonable construction of the Clean Water Act entitled to deference from this Court. We cannot agree. The Clean Water Act is not ambiguous. Further, it is a fundamental precept of this Court that we interpret unambiguous expressions of Congressional will as written. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Therefore, we hold that the EPA's Final Rule is not a reasonable interpretation of the Act and **VACATE** the Final Rule.

## I.  BACKGROUND

### A.  The Regulatory Background

#### 1.  *The Clean Water Act*

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." *Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 582 (6th Cir. 1988) (quoting 33 U.S.C. § 1251(a)).  The goal of the Clean Water Act is to achieve "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(2).  Thus, the Act provides that "the discharge of any pollutant by any person shall be unlawful." *Id*. § 1311(a).  "Pollutant" is a statutorily defined term that includes, at least, "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *Id*. § 1362(6).  The Supreme Court has held that this list is not exhaustive and that "pollutant" should be interpreted broadly. *Rapanos v. United States*, 547 U.S. 715, 724 (2006).

The Clean Water Act prohibits the discharge of any "pollutant" into navigable waters from any "point source" unless the EPA issues a permit under the NPDES permitting program, 33 U.S.C. §§ 1311(a), 1342, where a "point source" is "any discernible, confined, and discrete conveyance . . . from which pollutants are or may be discharged." *Id*. § 1362(14).  The permitting program constitutes an exception to the Clean Water Act's prohibition on pollutant discharges into the Nation's waters. *Id*. §§ 1311(a), 1342; 40 C.F.R. § 122.3.  Thus, if a party obtains a permit, the discharge of pollutants in accordance with that permit is not unlawful. *Id.*

Before a permit is issued, the EPA, or a state agency that has been approved by the EPA, evaluates the permit application to ensure that the discharge of a pollutant under the proposed circumstances will not cause undue harm to the quality of the water. *See* 33 U.S.C. § 1342.  In addition to granting permits for specific discharges, the EPA and state authorities may also grant general permits that allow for the discharge of a specific pollutant or type of

pollutant across an entire region.  *Id.*  For example, prior to the EPA's adoption of the Final Rule, the State of Washington had issued a general permit to allow for the application of all aquatic pesticides in the State.  *See Acquatechnex v. Washington Dep't of Ecology*, PCHB No. 02-090, 2002 WA ENV LEXIS 87, *2-5 (Pollution Control Hr'gs Bd. Dec. 24, 2002).[1] As a result, users of aquatic pesticides in Washington could discharge those pesticides covered by the rule without obtaining a permit.  These general permits "greatly reduce [the] administrative burden by authorizing discharges from a category of point sources within a specified geographic area." *S. Florida Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 108 n.* (2004) (citing 40 C.F.R. § 122.28(b)(2)(v)).  "Once [the] EPA or a state agency issues such a [general] permit, covered entities, in some cases, need take no further action to achieve compliance with the NPDES besides adhering to the permit conditions." *Id.*

### 2.     *The Federal Insecticide, Fungicide, and Rodenticide Act*

The EPA also regulates the labeling and sale of pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act.  Under the FIFRA, all pesticides sold in the United States must be registered with the EPA.  *See* 7 U.S.C. § 136 et seq.  The EPA approves an insecticide for registration only when it finds that the chemical, "when used in accordance with widespread and commonly recognized practice . . .[,] will not generally cause unreasonably adverse effects on the environment." *No Spray Coalition v. City of New York*, 351 F.3d 602, 604-05 (2d Cir. 2003) (quoting 7 U.S.C. § 136a(c)(5)(D)).  Under the FIFRA, the EPA issues a "label" for each registered pesticide, indicating the manner in which it may be used; the statute makes it unlawful "to use any pesticide in a manner inconsistent with its labeling." *Id.* (quoting 7 U.S.C. § 136j(a)(2)(6)).

---

[1] The State of California's State Water Resources Control Board (the "Board") also issued a general permit that covered all aquatic pesticide discharges, as long as the discharger certified that alternative options had been evaluated and that any impact the pesticide application had on the water quality would be reported to the Board.  General Permit No. CAG990003, 2001 Cal. ENV LEXIS 12, at *1, 3-4, 19-21 (July 19, 2001).

For nearly thirty years prior to the adoption of the Final Rule, pesticide labels issued under the FIFRA were required to contain a notice stating that the pesticide could not be "discharge[d] into lakes, streams, ponds, or public waters unless in accordance with an NPDES permit." EPA's Policy and Criteria Notice 2180.1 (1977). Despite amendments made to the FIFRA's labeling requirements over the years, pesticide labels have always included a notice about the necessity of obtaining an NPDES permit. *See* EPA's Policy and Criteria Notice 2180.1 (1984); Pesticide Registration ("PR") Notice 93-10 (July 29, 1993); PR Notice 95-1 (May 1, 1995); *see also* EPA-738-7-96-007 (Feb. 1996), *available at* http://www.epa.gov/oppsrrd1/REDs/factsheets/3095fact.pdf, (Pesticide Reregistration notification for 4, 4- Dimethyloxazolidine) (referring to the labeling requirement described in the PR Notice).

### 3.    *The Regulatory Framework Under the Final Rule*

Under the Clean Water Act, pollutants may only be discharged according to a permit unless they fit into one of the exceptions listed in the federal regulations at 40 C.F.R. § 122.3. The Final Rule revises the regulations by adding pesticides to these exceptions as long as they are used in accordance with the FIFRA's requirements. 71 Fed. Reg. at 68,485, 68,492. Specifically, the Final Rule states that pesticides applied consistently with the FIFRA do not require an NPDES permit in the following two circumstances:

> (1) The application of pesticides directly to waters of the United States in order to control pests. Examples of such applications include applications to control mosquito larvae, aquatic weeds, or other pests that are present in waters of the United States.
>
> (2) The application of pesticides to control pests that are present over waters of the United States, including near such waters, where a portion of the pesticides will unavoidably be deposited to waters of the United States in order to target the pests effectively; for example, when insecticides are aerially applied to a forest canopy where waters of the United States may be present below the

> canopy or where pesticides are applied over or near water
> for control of adult mosquitoes or other pests.

40 C.F.R. § 122.3(h).

Although the EPA, through its Final Rule, takes the position that pesticides are not generally pollutants, it makes an exception for "pesticide residuals," which "include[] excess amounts of pesticide." 71 Fed. Reg. at 68,487. "Pesticide residuals" are those portions of the pesticide that "remain in the water after the application and its intended purpose (elimination of targeted pests) have been completed . . . ." *Id.* The EPA concedes that pesticide residue (unlike pesticides generally) *is* a pollutant under the Clean Water Act because it is "waste[] of the pesticide application." *Id.* Nonetheless, the EPA contends that pesticide residue is not subject to the NPDES permitting program because "at the time of discharge to a water of the United States, the material in the discharge must be both a pollutant, and from a point source." *Id.* According to the EPA, the residue cannot be subject to the permitting program because by the time it becomes a pollutant it is no longer from a "point source." Since no "point source" is at play, the EPA reasons, pesticide residue is a "nonpoint source pollutant" and therefore not subject to the permitting requirements. *Id.*

## B.     Procedural Background

Timely petitions for review of the Final Rule were filed in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and D.C. Circuits by either the "Industry Petitioners"[2] or the "Environmental Petitioners."[3] The petitions for review were consolidated in this circuit by an order of the Judicial Panel on Multidistrict

---

[2]Agribusiness Association of Iowa, BASF Corporation, Bayer CropScience LP, CropLife America, Delta Council, Eldon C. Stutsman, Inc., FMC Corporation, Illinois Fertilizer & Chemical Association, The National Cotton Council of America, Responsible Industry for a Sound Environment, Southern Crop Production Association, and Syngenta Crop Protection, Inc., LP.

[3]Baykeeper, Californians for Alternatives to Toxics, California Sportfishing Protection Alliance, National Center for Conservation Science and Policy, Oregon Wild, Saint John's Organic Farm, Waterkeeper Alliance, Inc., Peconic Baykeeper, Inc., Soundkeeper, Inc., Environmental Maine, and Toxics Action Center.

Litigation, under 28 U.S.C. §§ 1407 and 2112(a)(3).  The self-titled "Industry Intervenors"[4] filed a motion to intervene in support of the Final Rule.[5]

Environmental Petitioners filed a timely motion to dismiss the petitions because of lack of subject matter jurisdiction or, alternatively, to transfer the cases to the Ninth Circuit.  Industry Petitioners, the EPA, and Industry Intervenors opposed this motion. The Environmental Petitioners have also filed a complaint challenging the Final Rule in the Northern District of California in order to preserve review of the Final Rule in the event this Court grants their motion to dismiss.  On July 24, 2007, we denied the motion to transfer and deferred the decision on the question of subject matter jurisdiction.

## II. JURISDICTION

Environmental Petitioners contend that this dispute should be dismissed for lack of subject matter jurisdiction, arguing that original review of the Final Rule by the courts of appeals is not covered by the grant of original jurisdiction set forth in the Clean Water Act, 33 U.S.C. § 1369(b)(1).  Environmental Petitioners are correct that "Congress did not intend court of appeals jurisdiction over all EPA actions taken pursuant to the Act." *Lake Cumberland Trust, Inc. v. EPA*, 954 F.2d 1218, 1222 (6th Cir. 1992) (quoting *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1431 (9th Cir. 1991)).  However, we conclude that, at a minimum, §1369(b)(1)(F) encompasses the action before us.

Under 33 U.S.C. § 1369(b)(1)(F), a party may challenge EPA actions "issuing or denying any permit under [33 U.S.C.] section 1342 . . ." in the appropriate circuit court.  The Clean Water Act's permitting program is set forth in § 1342.  The jurisdictional grant of § 1369(b)(1)(F) authorizes the courts of appeals "to review the regulations governing the issuance of permits under section 402, 33 U.S.C. § 1342, as well as the issuance or denial of a particular permit." *Am. Mining Cong. v. EPA*, 965 F.2d 759, 763 (9th Cir. 1992).  Thus, in *Natural Resources Defense Council, Inc. v. EPA*,

---

[4] Industry Intervenors include each of the Industry Petitioners listed above as well as American Farm Bureau Federation and American Forest & Paper Association.

[5] American Mosquito Association submitted a brief as amicus curiae in support of the Final Rule.

966 F.2d 1292, 1296-97 (9th Cir. 1992), the court held that it had jurisdiction to review an EPA rule exempting uncontaminated storm-water discharge from the permitting regulations.  The *Natural Resources* court concluded that it had "the power to review rules that regulate the underlying permit procedures." *Id*. at 1297 (citing *NRDC v. EPA*, 656 F.2d 768, 775 (D.C. Cir. 1981) and *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 136 (1976)).  The Final Rule before us today likewise regulates the permitting procedures, and we therefore conclude that jurisdiction is proper under § 1369(b)(1)(F).

## III.  DISCUSSION

### A.     Standard of Review

Our review of agency decisions has two components.  First, we determine whether the agency's chosen action complies with *Chevron*.  467 U.S. at 842-45; *see United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *Riverkeeper, Inc. v. EPA* ("*Riverkeeper II*"), 475 F.3d 83, 95 (2d Cir. 2007).  When conducting *Chevron* review of the Final Rule, we "examine the [Final Rule] against the statute that contains the EPA's charge." *Riverkeeper, Inc. v. EPA* ("*Riverkeeper I*"), 358 F.3d 174, 183 (2d Cir. 2004).  Here, we must determine whether "the intent of Congress is clear as to the precise question at issue." *Nations Bank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995); *Chevron*, 467 U.S. at 842.  "In making [this] threshold determination under *Chevron*, a reviewing court should not confine itself to examining a particular statutory provision in isolation.  Rather, the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2534 (2007).  If the intent of Congress is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If, and only if, the statute is silent or ambiguous regarding the question at issue, we then move to step two of *Chevron* review and ask whether "the agency's answer is based on a permissible construction of the statute." *Id.* at 843.  If the agency's

"interpretation is reasonable, we must defer to its construction of the statute." *Wachovia Bank, N.A. v. Watters*, 431 F.3d 556, 562 (6th Cir. 2005).

The second part of our review would require us to consider the Final Rule under the standards set forth by the Administrative Procedure Act section 10(2)(e), 5 U.S.C. § 706(2) (the "APA"), under which we are required to "hold unlawful and set aside agency action, findings, and conclusions" that, among other criteria, are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious where

> the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency experience.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)*; see also Citizens Coal Council*, 447 F.3d at 890. When conducting this form of review, we ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43. "The court is required to make a 'searching and careful review' in its assessment of the agency action, but 'the ultimate standard of review is a narrow one.'" *Citizens Coal Council*, 447 F.3d at 890 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## B.     The Parties' Positions

### 1.     *The Petitioners*

Environmental Petitioners argue: (1) that the EPA exceeded its authority under the Clean Water Act in issuing a rule that excludes pesticides from the definition of "pollutant" under 33 U.S.C. § 1362(6); (2) that the EPA exceeded its authority under the Clean Water Act when it determined that, while pesticides are discharged by point sources, the residue of these pesticides is nonetheless a "nonpoint source pollutant"; and (3) that the EPA may not exempt FIFRA-compliant applications of pesticides from the

requirements of the Clean Water Act. Industry Petitioners, on the other hand, argue that the Final Rule is arbitrary and capricious because it treats pesticides applied in violation of the FIFRA as pollutants, while it treats the very same pesticides used in compliance with the FIFRA as non-pollutants. In other words, the Industry Petitioners complain that whether something constitutes a pollutant should not hinge upon compliance with the FIFRA.

### 2. *The EPA*

As described above, the EPA's Final Rule exempts from the NPDES permitting program pesticides that are applied directly to the Nation's waters, or near such waters, in order to control pests. 40 C.F.R. § 122.3(h). The EPA says that its Final Rule exempts both pesticides generally and "pesticide residue," which includes "excess pesticide." 71 Fed. Reg. at 68,487.

The EPA provides two reasons that its Final Rule is reasonable. First, the EPA argues that the Clean Water Act as it applies to pesticides is ambiguous. The EPA contends that it reasonably determined that pesticides applied according to the FIFRA requirements are not pollutants and therefore are not subject to the NPDES permitting program. The EPA reasons that "Congress defined the term 'pollutant' in the Clean Water Act to mean one of 16 specific items." (EPA Br. at 22.) Of these sixteen, the EPA states that pesticides, which are either chemical or biological in nature, may only be considered to be "chemical wastes" or "biological materials." 71 Fed. Reg. at 68,486. The EPA argues that pesticides are not "chemical wastes" in the ordinary dictionary definition of the word "waste," because waste is that which is "eliminated or discarded as no longer useful or required after the completion of a process." *Id.* (quoting *The New Oxford American Dictionary* 1905 (Elizabeth J. Jewell & Frank Abate eds., 2001)). Rather than being wastes, the EPA reasons that pesticides applied according to the FIFRA's labeling requirements "are products that the EPA has evaluated and registered for the purpose of controlling target organisms, and are designed, purchased, and applied to perform that purpose." *Id.* The EPA next concludes that pesticides applied in

accordance with the FIFRA are not "biological materials" because to find otherwise would lead to the anomalous result "that biological pesticides are pollutants, while chemical pesticides used in the same circumstances are not." *Id.*

The EPA's second argument attempts to justify its Final Rule as applied to pesticide residue. In contrast to pesticides generally, which the EPA contends are *not* pollutants, the EPA concedes that pesticide residue and excess pesticide *are* pollutants within the meaning of the Clean Water Act because "they are wastes of the pesticide application." 71 Fed. Reg. at 68,487. The EPA also concedes that pesticides are discharged from a point source. *Id*. at 68,487-88. Nonetheless, the EPA concludes that no permit is required for pesticide applications that result in excess or residue pesticide because it interprets the Clean Water Act as requiring permits only for discharges that are "both a pollutant, and from a point source" at the time of discharge. *Id*. at 68,487.

## C.      Analysis

### 1.      *Are Pesticides Unambiguously "Pollutants" Within the Meaning of the Act?*

The first question under *Chevron* is whether the Clean Water Act unambiguously includes pesticides within its definition of "pollutant." Under this first step, this Court determines "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. This is determined by "employing traditional tools of statutory construction." *Id.* The meaning of a statute "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990) ("Our 'starting point is the language of the statute,' . . . but 'in expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'") (citations omitted). If Congress's intent is clear from the statutory language, then "that intent must be given effect." *Chevron*, 467 U.S. at 842-43.

As noted above, the Clean Water Act defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). This Court has previously concluded that the "broad generic terms" included in the definition of "pollutant" demonstrate Congress's intent to capture more than just the items expressly enumerated. *United States v. Hamel,* 551 F.2d 107, 110 (6th Cir. 1977) (concluding that the Clean Water Act covers, at a minimum, those pollutants covered under the Refuse Act, which applies to "all foreign substances" not explicitly exempted from coverage); *see also, e.g.*, *Cedar Point Oil Co.*, 73 F.3d at 565 ("[T]he breadth of many of the items in the list of 'pollutants' tends to eviscerate any restrictive effect."); *No Spray Coalition, Inc.*, 2005 U.S. Dist. LEXIS 11097, at *17 (citing S. Rep. No. 92-414 at 76 (1972), reprinted in 1972 U.S.C.C.A.N. 3668, 3742). However, we need not consider the term's breadth today. Rather, we find the plain language of "chemical waste" and "biological materials" in § 1362(b) to be unambiguous as to pesticides. This Court must, therefore, give effect to the Congress's expressed intent. *See Chevron*, 467 U.S. at 842-43.

### a.       Chemical Waste

Generally, a court should give a word in a statute its "ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import." *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Attorney*, 369 F.3d 960, 967 (6th Cir. 2004) (quoting *Williams v. Taylor*, 529 U.S. 420, 431-32 (2000)). The EPA refers the Court to *The New Oxford American Dictionary* (Jewell & Abate eds. 2001), which defines waste as "eliminated or discarded as no longer useful or required after the completion of a process." *Id*. at 1905. Industry Petitioners point the Court to *Black's Law Dictionary* (8th ed. 2004), which defines waste as "[r]efuse or superfluous material, esp. that after a manufacturing or chemical process." *Id*. at 1621. Similarly, the Ninth Circuit has accepted the American Heritage Dictionary's definition of waste as "any useless or worthless byproduct of a process or

the like; refuse or excess material." *N. Plains Res. Council v. Fidelity Exploration & Dev. Co.*, 325 F.3d 1155, 1161 (9th Cir. 2003); *Fairhurst v. Hagener*, 422 F.3d 1146, 1149 (2005).

Under any of these definitions of "waste," "chemical waste" for the purposes of the Clean Water Act would include "discarded" chemicals, "superfluous" chemicals, or "refuse or excess" chemicals. As such, under a plain-meaning analysis of the term, we cannot conclude that all chemical pesticides require NPDES permits. Rather, like our sister circuit in *Fairhurst*, we conclude that: so long as the chemical pesticide "is intentionally applied to the water [to perform a particular useful purpose] and leaves no excess portions after performing its intended purpose[] it is not a 'chemical waste,'" 422 F.3d at 1149, and does not require an NPDES permit. *Id*.

On the other hand, as Environmental Petitioners argue and the EPA concedes, excess pesticide and pesticide residue meet the common definition of waste. To this extent, the EPA's Final Rule is in line with the expressed intent of Congress, as the Rule defines these pesticide residues as pollutants "because they are wastes of the pesticide application." 71 Fed. Reg. at 68,487. The EPA aptly states:

> [P]esticides applied to land but later contained in a waste stream, including storm water regulated under the Clean Water Act, could trigger the requirement of obtaining an NPDES permit . . . . In addition, if there are residual materials resulting from pesticides that remain in the water after the application and its intended purpose has been completed, the residual materials are pollutants because they are substances that are no longer useful or required after the completion of a process.

(EPA Br. 29-30.) This Court agrees.

Therefore, at least two easily defined sets of circumstances arise whereby chemical pesticides qualify as pollutants under the Clean Water Act. In the first circumstance, a chemical pesticide is initially applied to land or dispersed in the air—these pesticides are sometimes referred to as either "terrestrial pesticides" or "aerial pesticides" and include applications "above" or "near" waterways. At some point following application, excess pesticide or residual pesticide finds its way into the

navigable waters of the United States. Pesticides applied in this way and later affecting the water are necessarily "discarded," "superfluous," or "excess" chemical. Such chemical pesticide residuals meet the Clean Water Act's definition of "chemical waste."

In the second circumstance, a chemical pesticide is applied directly and purposefully to navigable waters to serve a beneficial purpose—such pesticides are often referred to as "aqueous" or "aquatic" pesticides. As contemplated by the EPA, if residual aquatic pesticide "remain[s] in the water after the application and [the pesticide's] intended purpose has been completed," then the residue would likewise qualify as a "chemical waste." (EPA Br. 29-30.) As such, these chemical wastes would unambiguously fall within the ambit of the Clean Water Act.

This second scenario, of course, leads to the inevitable quandary that both non-waste aqueous pesticide and pesticide residual are applied to water at the same moment, which then gives rise to the question of how the EPA can regulate and permit the residual. However, this problem is more theoretical than practical. In reality, whether or not a particular chemical pesticide needs to be regulated can be easily answered by both the EPA's and industry's experience with that pesticide. If, as was the case in *Fairhurst*, a chemical such as antimycin leaves no excess portions after performing its intended purpose, then that chemical's use need not be regulated. *See Fairhurst*, 422 F.3d at 1149. If, on the other hand, a chemical pesticide is known to have lasting effects beyond the pesticide's intended object, then its use must be regulated under the Clean Water Act. *See also Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532-33 (9th Cir. 2001).

### b.    *Biological Materials*

Continuing our review under *Chevron*, we must examine the "ordinary, contemporary, [and] common meaning" of "biological materials." *Grand Traverse Band*, 369 F.3d at 967. Environmental Petitioners point out that *Webster's Third New International Dictionary* (Gove ed. 1993) defines "material" as "of, relating to, or consisting of matter" and "the basic matter from which the whole or the great part of

something is made." *Id*. at 1392. The *Oxford English Dictionary* provides that "material" is "that which constitutes the substance of a thing (physical or non-physical); a physical substance; a material thing." OED Online, *available at* http://dictionary.oed.com/cgi/entry/00303279?query_type=word&queryword=materi al&first=1&max_to_show=10&sort_type=alpha&result_place=1&search_id=VoPl-c VwRjA-12823&hilite=00303279. The plain, unambiguous nature of this language compels this Court to find that matter of a biological nature, such as biological pesticides, qualifies as a biological material and falls under the Clean Water Act if it is "discharged into water." 33 U.S.C. § 1362(6).

The EPA points to Ninth Circuit case law that holds that "mussel shells and mussel byproduct are not pollutants" under the Clean Water Act. *Ass'n to Protect Hammersley, Eld & Totten Inlets v. Taylor*, 299 F.3d 1007, 1016 (9th Cir. 2002). The *Hammersley* court found the Clean Water Act to be "ambiguous on whether 'biological materials' means *all* biological matter regardless of quantum and nature." *Id*. While that case is distinguishable, we choose a more limited analysis.[6] We see our obligation not as defining the outermost bounds of "biological materials," but rather simply as deciding whether biological pesticides fit into the ordinary meaning of "biological materials."

The term "biological materials" cannot be read to exclude biological pesticides or their residuals. The EPA's Final Rule treats biological pesticides no differently from chemical pesticides, exempting both from NPDES permitting requirements in certain circumstances. *See* 71 Fed. Reg. at 68,492. We find this interpretation to be contrary to the plain meaning of the Clean Water Act. In 33 U.S.C. § 1362, Congress purposefully included the term "biological materials," rather than a more limited term such as "biological wastes." Congress could easily have drafted the list of pollutants in the Clean Water Act to include "chemical wastes" and "biological wastes." But, here, the word "waste" does not accompany "biological materials." Thus, if we are to give

---

[6]The *Hammersley* court based its conclusion on the fact that shells and shell byproduct of shellfish-farming facilities are the result of natural biological processes, not the result of a transforming human process. *See Hammersley*, 299 F.3d at 1016-17.

meaning to the word "waste" in "chemical waste," we must recognize Congress's intent to treat biological and chemical pesticides differently.

This interpretation is consistent with the precedent of this Court and others. In *National Wildlife Federation v. Consumer Power Co.*, 862 F.2d 580 (6th Cir. 1988), we determined that "[m]illions of pounds of live fish, dead fish and fish remains annually discharged in Lake Michigan by [a] facility are pollutants within the meaning of the [Clean Water Act], since they are "biological materials." Likewise, the District Court of Maine determined that "salmon feces and urine that exit the net pens and enter the waters are pollutants as they constitute 'biological materials' or 'agricultural wastes.'" *United States Pub. Interest Research Group v. Atl. Salmon of Maine*, 215 F. Supp. 2d 239, 247 (D. Me. 2002) (citing *Higbee v. Starr*, 598 F. Supp. 323, 330-31 (D. Ark. 1984) *aff'd*, 782 F.2d 1048 (8th Cir. 1985)). Biological pesticides similarly must be considered "biological materials." Biological pesticides consist of artificial concentrations of viruses, bacteria, fungi, plant materials, and/or other biological materials. *See* Pesticides: Glossary, U.S. EPA, *available at* http://www.epa.gov/pesticides/glossary. Congress defined "pollution" as "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19). Adding biological pesticides to water undeniably alters its biological integrity. Therefore, we find biological pesticides to be "biological materials" under the Clean Water Act.

2.      *Are Chemical Pesticide Residuals Added to the Water by "Point Sources?"*[7]

The EPA further defends its Final Rule by arguing that excess pesticide and residue pesticide are not discharged from a "point source." In other words, though excess and residue pesticides have exactly the same chemical composition and are discharged from the same point source at exactly the same time as the original pesticide, and though excess and residue pesticides would not enter the Nation's waterways but for

---

[7]This analysis is not necessary for biological pesticides because, as discussed above, both biological pesticides and their residuals are pollutants under the Clean Water Act. Because biological pesticides are discharged from a "point source" they must be regulated under the Act.

the discharge of the original pesticide, the EPA concludes that excess and residue pesticides are not discharged from a "point source" because at the moment of discharge there is only pesticide. This is so, according to the EPA, because excess and residue pesticides do not exist until after the discharge is complete, and therefore "should be treated as a nonpoint source pollutant." 71 Fed. Reg. at 65,847.

The Clean Water Act defines "point source" as "any discernible, confined, and discrete conveyance," including a variety of mechanisms such as "container," "rolling stock," or "vessel or other floating craft." 33 U.S.C. § 1362(14). The EPA and the courts agree that pesticides are applied by point sources. *See* 71 Fed. Reg. at 65,847; *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1185 (9th Cir. 2002); *Headwaters*, 243 F.3d at 528. The EPA argues that, at the time of discharge, the pesticide is a nonpollutant, and the excess pesticide and pesticide residues are not created until later, presumably after they are already in the water. Therefore, according to the EPA, pesticides at the time of discharge do not require permits because they are not yet excess pesticides or residue pesticides. But there is no requirement that the discharged chemical, or other substance, immediately cause harm to be considered as coming from a "point source." Rather, the requirement is that the discharge come from a "discernible, confined, and discrete conveyance," 33 U.S.C. § 1362(14), which is the case for pesticide applications.

The EPA offers no direct support for its assertion that a pesticide must be "excess" or "residue" at the *time of discharge* if it is to be considered as discharged *from a "point source*." This omission of authority is understandable, as none exists. The Clean Water Act does not create such a requirement. Instead, it defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The EPA's attempt at temporally tying the "addition" (or "discharge") of the pollutant to the "point source" does not follow the plain language of the Clean Water Act. Injecting a temporal requirement to the "discharge of a pollutant" is not only unsupported by the Act, but it is also contrary to the purpose of the permitting program, which is "to prevent harmful discharges into the Nation's waters."

*Defenders of Wildlife*, 127 S. Ct. at 2525. If the EPA's interpretation were allowed to stand, discharges that are innocuous at the time they are made but extremely harmful at a later point would not be subject to the permitting program. Further, the EPA's interpretation ignores the directive given to it by Congress in the Clean Water Act, which is to protect water quality. As the EPA itself recognizes, "Congress generally intended that pollutants be controlled at the source whenever possible." 73 Fed. Reg. at 33,702 (citing S. Rep. No. 92-414, p. 77 (1972)). Here, it is certainly possible for pesticide residue to be controlled at its source because the discharge of the pesticide introduces such residue into the water.

The EPA's newly asserted temporal element also runs contrary to its own recent interpretation of the Clean Water Act's term "addition." *See* 73 Fed Reg. 33,697 (June 13, 2008). The EPA determined that transfers of water from one body of water to another do not constitute the "addition" of a pollutant to the new body of water, and in doing so clarified its understanding of the term "addition." 73 Fed Reg. 33,697. The EPA explained:

> Given the broad definition of "pollutant," transferred (and receiving) water will always contain intrinsic pollutants, but the pollutants in transferred water are already *in* "the waters of the United States" before, during, and after the water transfer. Thus, there is no "addition"; nothing is being added "to" "the waters of the United States" by virtue of the water transfer, because the pollutant at issue is already part of "the waters of the United States" to begin with.
>
> . . . .
>
> As noted above, EPA's longstanding position is that an NPDES pollutant is "added" when it is introduced into a water from the "outside world" by a point source. *Gorsuch*, 693 F.2d at 174-75.

*Id.* at 33,701. Given the EPA's understanding of "addition" of a pollutant as stated above, it is clear that under the meaning of the Clean Water Act, pesticide residue or excess pesticide—even if treated as distinct from pesticide—is a pollutant discharged from a point source because the pollutant is "introduced into a water from the 'outside world' by" the pesticide applicator from a "point source." *See id.* This interpretation

coincides with the method of determining whether a discharge is from a "point source" that the Supreme Court recently cited with approval:  "For an addition of pollutants to be from a point source, the relevant inquiry is whether—but for the point source—the pollutants would have been added to the receiving body of water."  *Miccosukee*, 541 U.S. at 103 (quoting *Florida Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 280 F.3d 1364, 1368 (11th Cir. 2002)).  It is clear that but for the application of the pesticide, the pesticide residue and excess pesticide would not be added to the water; therefore, the pesticide residue and excess pesticide are from a "point source."

### 3.      *May the Final Rule Stand?*

For all of these reasons, we conclude that the statutory text of the Clean Water Act forecloses the EPA's Final Rule.  The EPA properly argues that excess chemical pesticides and chemical pesticide residues, rather than all chemical pesticides, are pollutants.  However, the Final Rule does not account for the differences between chemical and biological pesticides under the language of the Clean Water Act.  Further, because the Act provides that residual and excess chemical pesticides are added to the water by a "point source" there is no room for the EPA's argument that residual and excess pesticides do not require an NPDES permit.  The "point source" from which the residue originates is easily discernable and necessarily must "be controlled at the source."  *See* 73 Fed. Reg. at 33,702.  Given all of the above in combination with the EPA's interpretation that "[p]oint sources need only convey pollutants into navigable waters to be subject to the Act," *id.* at 33,703, dischargers of pesticide pollutants are subject to the NDPES permitting program in the Clean Water Act.  As such, the EPA's Final Rule cannot stand.  Because the Clean Water Act's text bars the Final Rule we make no determination regarding the validity of the issuance of the Final Rule under the APA, nor do we analyze the relationship between the Clean Water Act and the FIFRA.

## CONCLUSION

For the foregoing reasons, Environmental Petitioners' petitions are **GRANTED** in part and **DENIED** in part, and Industry Petitioners' petitions are **DENIED** in whole. We **VACATE** the Final Rule.