RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: UNITED STATES DEPARTMENT OF DEFENSE AND UNITED STATES ENVIRONMENTAL PROTECTION AGENCY FINAL RULE: CLEAN WATER RULE: DEFINITION OF "WATERS OF THE UNITED SATES," 80 FED. REG. 37,054 (JUNE 29, 2015).

_____

MURRAY ENERGY CORPORATION (15-3751); STATE OF OHIO, et al. (15-3799); NATIONAL WILDLIFE FEDERATION (15-3817); NATURAL RESOURCES DEFENSE COUNCIL, INC. (15-3820); STATE OF OKLAHOMA (15-3822); CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al. (15-3823); STATE OF NORTH DAKOTA, et al. (15-3831); WATERKEEPER ALLIANCE INC., et al. (15-3837); PUGET SOUNDKEEPER ALLIANCE, et al. (15-3839); AMERICAN FARM BUREAU FEDERATION, et al. (15-3850); STATE OF TEXAS, et al. (15-3853); UTILITY WATER ACT GROUP (15-3858); SOUTHEASTERN LEGAL FOUNDATION, INC., et al. (15-3885); STATE OF GEORGIA, et al. (15-3887); ONE HUNDRED MILES, et al. (15-3948); SOUTHEAST STORMWATER ASSOCIATION, INC., et al. (15-4159); MICHIGAN FARM BUREAU (15-4162); WASHINGTON CATTLEMEN'S ASSOCIATION (15-4188); ASSOCIATION OF AMERICAN RAILROADS, et al. (15-4211); TEXAS ALLIANCE FOR RESPONSIBLE GROWTH, ENVIRONMENT, AND TRANSPORTATION (15-4234); AMERICAN EXPLORATION & MINING ASSOCIATION (15-4305); ARIZONA MINING ASSOCIATION, et al. (15-4404),

*Petitioners*,

*v.*

UNITED STATES DEPARTMENT OF DEFENSE, DEPARTMENT OF THE ARMY CORPS OF ENGINEERS and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

Nos. 15-3751 /3799/ 3817/ 3820/ 3822/ 3823/ 3831/ 3837/ 3839/ 3850/ 3853/ 3858/ 3885/ 3887/ 3948/ 4159/ 4162/ 4188/ 4211/ 4234/ 4305/ 4404

1

On Petitions for Review of Final Rule of the United States Department
of Defense and United States Environmental Protection Agency.
Judicial Panel on Multi-District Litigation, No. 135.

Argued:  December 8, 2015

Decided and Filed:  February 22, 2016

Before:  KEITH, McKEAGUE, and GRIFFIN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:**  Eric E. Murphy, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus,
Ohio, for Petitioners.  Martha C. Mann, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Respondents.

McKEAGUE, J., delivered the opinion in which GRIFFIN, J., joined in the result.
GRIFFIN, J. (pp 19–31), delivered a separate opinion concurring in the judgment.  KEITH, J.
(pp. 32–33), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.  This multi-circuit case consists of numerous consolidated
petitions challenging the validity of the "Clean Water Rule" recently published by the U.S. Army
Corps of Engineers and U.S. Environmental Protection Agency ("the Agencies").  The Clean
Water Rule is intended to clarify the scope of "the waters of the United States" subject to
protection under the Clean Water Act.  The Act provides that certain specified actions of the
EPA Administrator are reviewable directly in the U.S. Circuit Courts of Appeals.  Because of
uncertainty about whether the Agencies' adoption of the Clean Water Rule is among these
specified actions, parties challenging the Rule have filed petitions in both district courts and
circuit courts across the country.  Many of the petitions have been transferred to the Sixth Circuit
for consolidation in this action.  Many of the petitioners and other parties now move to dismiss
the very petitions they filed invoking this court's jurisdiction, contending this court lacks
jurisdiction to review the Clean Water Rule.

The movants find support for their position in the language of the Clean Water Act's judicial review provisions, which purport to define circuit court jurisdiction specifically and narrowly. Over the last 35 years, however, courts, including the Supreme Court and the Sixth Circuit, have favored a "functional" approach over a "formalistic" one in construing these provisions. These precedents support the Agencies' position that this court does have jurisdiction. The district courts that have confronted the jurisdictional question in this litigation have arrived at conflicting answers.[1] For the reasons that follow I conclude that Congress's manifest purposes are best fulfilled by our exercise of jurisdiction to review the instant petitions for review of the Clean Water Rule.

## I. BACKGROUND

Petitioners in these various actions, transferred to and consolidated in this court by the Judicial Panel on Multi-District Litigation for handling as a multi-circuit case, challenge the validity of a Final Rule adopted by respondents U.S. Army Corps of Engineers and U.S. Environmental Protection Agency, "the Clean Water Rule." 80 Fed. Reg. 37,054 (June 29, 2015). The Clean Water Rule clarifies the definition of "waters of the United States," as used in the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, "through increased use of bright-line boundaries" to make "the process of identifying waters protected under the Clean Water Act easier to understand, more predictable and consistent with the law and peer reviewed science, while protecting the streams and wetlands that form the foundation of our nation's water resources." 80 Fed. Reg. at 37,055. Petitioners contend that the definitional changes effect an expansion of respondent Agencies' regulatory jurisdiction and dramatically alter the existing balance of federal-state collaboration in restoring and maintaining the integrity of the nation's waters. Petitioners also contend the new bright-line boundaries used to determine which tributaries and waters adjacent to navigable waters have a "significant nexus" to waters protected under the Act are not consistent with the law as defined by the Supreme Court, and were adopted by a process not in conformity with the rulemaking requirements of the Administrative Procedures Act

---

[1]*See Murray Energy Corp. v. U.S. E.P.A.*, 2015 WL 5062506 (N.D. W.Va. Aug. 26, 2015) (holding jurisdiction lies in circuit court); *State of Georgia v. McCarthy*, 2015 WL 5092568 at *2–3 (S.D. Ga. Aug. 27, 2015) (same); *North Dakota v. U.S. E.P.A.*, 2015 WL 5060744 at *2 (D. N.D. Aug. 27, 2015) (holding jurisdiction lies in district court).

("APA"). The Agencies maintain that the requirements of the APA were met and that the Rule is a proper exercise of their authority under the Clean Water Act.

The Rule became effective on August 28, 2015. On October 9, 2015, however, we issued a nationwide stay of the Rule pending further proceedings in this action. *In re EPA and Dep't of Def. Final Rule,* 803 F.3d 804 (6th Cir. 2015). We found that petitioners had demonstrated a substantial possibility of success on the merits of their claims and that the balance of harms militated in favor of preserving the status quo pending judicial review.

Meanwhile, eight motions to dismiss have been filed by numerous petitioners and intervenors. The motions assert that judicial review is properly had in the district courts, not here. They contend the instant challenges to the Clean Water Rule do not come within the judicial review provisions of the Clean Water Act, 33 U.S.C. § 1369(b)(1).

Section 1369(b)(1) identifies seven kinds of action by the EPA Administrator that are reviewable directly in the circuit courts. Only two of the seven kinds of action listed in § 1369(b)(1) are implicated here, subsections (E) and (F). In its entirety, § 1369(b)(1) provides as follows:

> (1) Review of the Administrator's action
>
> (A) in promulgating any standard of performance under section 1316 of this title,
>
> (B) in making any determination pursuant to section 1316(b)(1)(C) of this title,
>
> (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title,
>
> (D) in making any determination as to a State permit program submitted under section 1342(b) of this title,
>
> (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title,
>
> (F) in issuing or denying any permit under section 1342 of this title, and
>
> (G) in promulgating any individual control strategy under section 1314(l) of this title,
>
> may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person.

> Any such application shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such 120th day.

33 U.S.C. § 1369(b)(1).

Movants contend the EPA's and the Corps' adoption and promulgation of the Clean Water Rule is not action of the Administrator "in issuing or promulgating any effluent limitation or other limitation" or "in issuing or denying any permit" under § 1369(b)(1)(E) or (F). They contend the Clean Water Rule is simply a definitional rule and that neither the statutory language nor the legislative history evidences congressional intent to authorize direct review of such action in the circuit courts.

## II.  ANALYSIS

### A.  General Standards

The question of subject matter jurisdiction is a question of law the court addresses de novo. *Iowa League of Cities v. U.S. E.P.A.*, 711 F.3d 844, 861 (8th Cir. 2013). That is, the Agencies' interpretation of the Clean Water Act is entitled to no deference in this regard. *Friends of the Everglades v. U.S. E.P.A.*, 699 F.3d 1280, 1285 (11th Cir. 2012).

Federal courts are courts of limited jurisdiction and have subject matter jurisdiction only as authorized by the Constitution and by Congress. *Id.* at 1289. Here, the court's authority to conduct direct review of the Agencies' challenged action, must be found, if at all, in the Clean Water Act, 33 U.S.C. § 1369(b)(1). *Id.* at 1285 (recognizing availability of direct circuit court review only over those actions specifically enumerated in § 1369(b)(1)). Not all actions taken under the Clean Water Act are directly reviewable in the circuit courts. *Nat'l Cotton Council of America v. U.S. E.P.A.*, 553 F.3d 927, 933 (6th Cir. 2009). Where review is available under § 1369(b)(1), "it is the exclusive means of challenging actions covered by the statute." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S.Ct. 1326, 1334 (2013). Matters not reviewable under § 1369(b)(1) may be actionable in the district courts by other means. *See id.* (recognizing availability of private enforcement action under 33 U.S.C. § 1365); *Narragansett Elec. Co. v. U.S. E.P.A.*, 407

F.3d 1, 8 (1st Cir. 2005) (recognizing availability of judicial review in district court under the APA).

Whether subject matter jurisdiction lies in the circuit courts is governed by the intent of Congress. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 746 (1985). In determining the scope of circuit court jurisdiction Congress intended to prescribe under the Clean Water Act, the analysis must begin with the statutory language. *Id.* at 735. Yet, even where statutory language may seem unambiguous, "plain meaning, like beauty, is sometimes in the eye of the beholder." *Id.* at 737. The parties agree that subsections (E) and (F) are the only two provisions of § 1369(b)(1) that potentially apply.

### B. Statutory Language

#### 1. *Subsection (E) – "Other Limitation"*

Movants contend the Rule's definition of "waters of the United States" is not, under § 1369(b)(1)(E), "an effluent limitation or other limitation" approved or promulgated under 33 U.S.C. § 1311, 1312, 1316, or 1345. "Effluent limitation" is defined as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

The Agencies do not contend that the Clean Water Rule is an action in approving or promulgating an effluent limitation, but rather that it is an "other limitation." The Act does not define "other limitation." Inasmuch as "effluent limitation" is defined as a "restriction" on discharges from point sources, the Agencies contend "other limitation" must be understood as a different kind of "restriction." They contend the Rule's clarification of the scope of "waters of the United States" protected under the Clean Water Act constitutes an "other limitation" in two respects. First, it has the effect of restricting the actions of property owners who discharge pollutants from a point source into covered waters. Second, it has the effect of imposing limitations or restrictions on regulatory bodies charged with responsibility for issuing permits

under the National Pollutant Discharge Elimination System ("NPDES") to those who discharge pollutants into covered waters.

On its face, the Agencies' argument is not compelling. After all, the Rule's clarified definition is not self-executing. By clarifying the definition, the Agencies did not approve or promulgate any limitation that imposes *ipso facto* any restriction or requirement on point source operators or permit issuers. Rather, they promulgated a definitional rule that, operating in conjunction with other regulations, will result in imposition of such limitations. Is such an indirect consequence sufficient to bring the Rule within the scope of § 1369(b)(1)(E)?

The Agencies say yes and cite several cases in support. The seminal case supporting their construction of subsection (E) is *E.I. du Pont de Nemours Co. v. Train*, 430 U.S. 112, 136 (1977), where the Supreme Court eschewed a strict, literal reading. The Court characterized a construction that would provide for direct circuit court review of individual actions issuing or denying permits, but disallowed such review of the "basic regulations governing those individual actions," as a "truly perverse situation." *Id.* Hence, even though § 1369(b)(1) provided for circuit court review only of limitations promulgated under certain enumerated sections, and the challenged regulation was promulgated under a different section—which was, however, closely related to one of the enumerated sections—the Court had "no doubt that Congress intended review of the two sets of regulations to be had in the same forum." *Id.* at 136–37. The Court thus construed § 1369(b)(1)(E), in light of Congress's manifest intent, to encompass review of more agency actions than a literal reading of the provision would suggest.

*E.I. du Pont* can be read in more ways than one. As the Agencies see it, the Clean Water Rule is a "basic regulation governing those individual actions" taken by the EPA Administrator (e.g., promulgation of limitations) that *are* subject to direct circuit court review. Accordingly, giving § 1369(b)(1) a practical construction per *E.I. du Pont*, the Agencies argue that Congress intended the lawfulness of the Clean Water Rule to be subject to direct circuit court review.

Their position finds support in several decisions of our sister circuits. In *Nat. Res. Def. Council v. U.S. E.P.A.*, 673 F.2d 400 (D.C. Cir. 1982) (J. Ginsburg), a case closely analogous to ours, the D.C. Circuit addressed numerous consolidated challenges to EPA regulations that had

been filed in circuit courts of appeals and district courts. The regulations did not establish any numerical limitations, but prescribed permitting procedures that constituted "a limitation on point sources and permit issuers and a restriction on the untrammeled discretion of the industry." *Id.* at 405 (internal quotation marks omitted). Following *E.I. du Pont*, the court held this "limitation" was sufficient to bring the regulations within the ambit of direct circuit court review under § 1369(b)(1)(E). Employing "a practical rather than a cramped construction," the court held that direct review in the circuit court was appropriate, even though the regulations did not impose technical requirements but were "far more general and rest[ed] dominantly on policy choices." *Id.* In fact, the court cited several reasons for concluding that such "broad, policy-oriented rules" are actually more suitable for direct circuit court review than "specific technology-based rules." *Id.* at 405 n.15. The court noted that *E.I. du Pont* "does not unequivocally dictate our result but [its] reasoning strongly supports our holding that we have jurisdiction." *Id.* at 406.

In *Virginia Elec. & Power Co. v. Costle*, 566 F.2d 446 (4th Cir. 1977) ("*VEPCO*"), the Fourth Circuit addressed consolidated petitions challenging EPA regulations prescribing requirements for the location, design, construction and capacity of cooling water intake structures used to withdraw from, rather than discharge into, covered waters. The challengers argued that such requirements could not be "other limitations" under § 1369(b)(1)(E) until they were actually adopted in an individual permit proceeding. Because the requirements were not self-executing, the challengers argued they were only presumptively applicable and did not actually impose any limitation or restriction on point-source discharges. The court held the argument was foreclosed by *E.I. du Pont*. *VEPCO*, 566 F.2d at 449–50. The court held the requirement that certain information be considered in determining the best available technology for intake structures was a sufficient restriction on the discretion of point source operators and permit issuers to constitute an "other limitation" under subsection (E). *Id.* Further, citing *E.I. du Pont*, the court noted the regulations were so closely related to effluent limitations, that "it would be anomalous to have their review bifurcated between different courts." *Id.* at 450. The court held that circuit court review was proper under subsection (E), stating that "this result is consistent with the jurisdictional scheme of the Act, which in general leaves review of standards of nationwide applicability to the courts of appeals, thus furthering the aim of Congress to achieve nationally uniform standards." *VEPCO*, 566 F.2d at 451.

More recently, the Eighth Circuit followed suit. In *Iowa League of Cities v. U.S. E.P.A.*, 711 F.3d 844 (8th Cir. 2013), the court addressed two letters from the EPA sent to a senator and alleged to have effectively established new regulatory standards governing municipal water treatment processes. The court first noted that "the Supreme Court has recognized a preference for direct appellate review of agency action pursuant to the APA." *Id.* at 861 (citing *Fla. Power*, 470 U.S. at 745). The court rejected the EPA's contention that the subject letters, couched in terms of what "should not be permitted" by regulated entities, did not "promulgate" a binding limitation. Noting that the EPA had characterized the letters as expressing its position or policy, the court dismissed the notion that the instruction was not binding as "Orwellian Newspeak." *Id.* at 865. The court did not cite *E.I. du Pont*, but adopted the *VEPCO* formulation of "limitation" and went on to hold that subsection (E) applies if "entities subject to the CWA's permit requirements face new restrictions on their discretion with respect to discharges or discharge-related processes." *Id*. at 866.

These decisions from the D.C., Fourth, and Eighth Circuits demonstrate courts' willingness to view *E.I. du Pont* as license to construe Congress's purposes in § 1369(b)(1) more generously than its language would indicate.[2] However, movants herein read *E.I. du Pont* differently. They argue *E.I. du Pont*'s holding is narrower and should be limited to its facts. In support they cite decisions from the Eleventh and Ninth Circuits refusing to find circuit court jurisdiction under subsection (E).

In both *Friends of the Everglades v. U.S. E.P.A.*, 699 F.3d 1280, 1287 (11th Cir. 2012), and *Northwest Environmental Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1015–16 (9th Cir. 2008), the courts reached *results* different from those reached in the D.C., Fourth, and Eighth Circuits. However, the decisions in all five circuits are readily reconcilable. In both *Friends of the Everglades* and *Northwest Environmental*, the courts acknowledged the above discussed *NRDC* and *VEPCO* rulings, but found the regulations before them materially distinguishable from those deemed to come within the scope of § 1369(b)(1)(E). Far from *restricting* "untrammeled

---

[2]Most recently, the "functional approach" employed in these cases was applied by two district courts in relation to the Clean Water Rule in *this* litigation to find circuit court jurisdiction under subsection (E). *Murray Energy Corp. v. U.S. E.P.A.*, 2015 WL 5062506 (N.D. W.Va. Aug. 26, 2015); *State of Georgia v. McCarthy*, 2015 WL 5092568 at *2–3 (S.D. Ga. Aug. 27, 2015).

discretion," the regulations at issue in *Friends of the Everglades* and *Northwest Environmental* actually created *exemptions* from limitations. Both courts concluded that an exemption from limitation simply cannot be fairly characterized as a limitation. Neither court criticized the approach adopted in *E.I. du Pont* and applied in *NRDC* and *VEPCO*. Nor did either court reject the notion that an "other limitation" can be made out by an indirect restriction on discretion. Rather, *Friends of the Everglades* and *Northwest Environmental* held that no construction could render an exemption from limitation what it plainly is not: a "limitation" under subsection (E).[3] The two lines of authority are therefore not inconsistent.

Here we acknowledge that the Rule is definitional only and does not *directly* impose any restriction or limitation. Yet, neither does the Rule create an exemption from limitation. By clarifying the definition of "waters of the United States," the Rule undeniably has the *indirect* effect of altering permit issuers' authority to restrict point-source operators' discharges into covered waters. The alteration invariably results in expansion of regulatory authority in some instances and imposition of additional restrictions on the activities of some property owners. These restrictions, of course, are presumably the reason for petitioners' challenges to the Rule. Hence, although the Rule is definitional in nature, it is undeniably, in the language of *E.I. du Pont*, a "basic regulation governing other individual actions issuing or denying permits." 430 U.S. at 136. To rule that Congress intended to provide direct circuit court review of such individual actions but intended to exclude from such review the definitional Rule on which the process is based, would produce, per *E.I. du Pont*, "a truly perverse situation." *Id.* To avoid just such an outcome, the *E.I. du Pont* Court reasoned that Congress must have intended that both types of regulation would be subject to review in the same forum, i.e., the circuit courts.[4]

---

[3]These authorities were cited as persuasive in *this* litigation by one district court. *North Dakota v. U.S. E.P.A.*, 2015 WL 5060744 at \*2 (D. N.D. Aug. 27, 2015). However, the *North Dakota* court ignored the fact that, unlike the regulations at issue in those cases, the Clean Water Rule does not create an exemption. And despite noting the pertinence of the *NRDC-VEPCO-Iowa League* line of cases, the *North Dakota* court conspicuously ignored their holdings.

[4]*E.I. du Pont*'s analysis is also dispositive of movants' argument that review under subsection (E), by its terms, applies only to action by the EPA Administrator approving or promulgating a limitation "under section 1311, 1312, 1316, or 1345 of this title." Movants contend that all of these sections pertain to effluent limitations. Inasmuch as the Agencies do not even argue that the Clean Water Rule represents an effluent limitation, movants contend the Rule cannot be deemed to have been promulgated under any of these sections.

*E.I. du Pont* is the last word from the Supreme Court on § 1369(b)(1)(E).  It is still good law.  Our sister courts in the D.C., Fourth, and Eighth Circuits have all applied *E.I. du Pont*'s approach and have defined the scope of direct circuit court review under subsection (E) more broadly than a strict interpretation of its language would indicate.  The two circuit-level decisions, from the Ninth and Eleventh Circuits, that declined to find circuit court jurisdiction under subsection (E) did so in relation to agency action materially distinguishable from the Rule here at issue.  The movants' position is thus devoid of substantial case law support.  While their plain-language arguments are not without facial appeal, we are hardly at liberty to ignore the consistent body of case law that has sprung from that language in encounters with the real world.  In response to concern about producing a "perverse situation" seemingly at odds with congressional purpose, movants have no answer beyond their argument that Congress must be held to say what it means and mean what it says. Were we writing on a blank slate, the argument would be more persuasive, but we're not.  As an "inferior court," we are obliged to take our lead from the Supreme Court.  Having discerned no persuasive grounds to depart from the rationale that controlled in *E.I. du Pont*, I conclude that we, like our sister circuits, must follow its lead.

Viewing the Clean Water Rule through the lens created in *E.I. du Pont* reveals a regulation whose practical effect will be to *indirectly* produce various limitations on point-source operators and permit issuing authorities.  Accordingly, although the Rule does not itself impose any limitation, its effect, in the regulatory scheme established under the Clean Water Act, is such as to render the Rule, per the teaching of *E.I. du Pont* and its progeny, subject to direct circuit court review under § 1369(b)(1)(E).

### 2. *Subsection (F) – "Issuing or Denying Permit"*

Evaluation of the second claimed basis for direct circuit court review proceeds in like manner.  Movants argue that § 1369(b)(1)(F) does not justify jurisdiction in the circuit court because the Clean Water Rule is not an action of the EPA Administrator "in issuing or denying a permit."  Yet, in relation to subsection (F), too, the Supreme Court has opened the door to

---

Yet, the Rule purports to be adopted under authority, *inter alia*, of section 311 (33 U.S.C. § 1311).  80 Fed. Reg. at 37,055.  And subsection (E) prescribes direct circuit court review of any "other limitation," in addition to any effluent limitation.  It follows that the Rule, representing an "other limitation" as defined in *E.I. du Pont* and its progeny, and adopted pursuant to § 1311, comes within the scope of circuit court review under § 1369(b)(1)(E).

constructions other than a strict literal application. In *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 196–97 (1980), the Court reversed the Ninth Circuit and held that an action of the Administrator "functionally similar" to denial of a permit is encompassed within subsection (F). If the "precise effect" of the action would be to deny a permit, the Court reasoned, it would be irrational to conclude, based on a strictly literal application of subsection (F), that the action would be subject to review in district court rather than circuit court. The Court recognized that direct review in the circuit court "would best comport with the congressional goal of ensuring prompt resolution of challenges to EPA's actions." *Id.* at 196. Addition of another level of judicial review, the Court observed, "would likely cause delays in resolving disputes under the Act." *Id.* at 197. In conclusion, the Court remarked: "Absent a far clearer expression of congressional intent, we are unwilling to read the Act as creating such a seemingly irrational bifurcated review system." *Id.*

Here, similarly, the Agencies contend that the effect of the Clean Water Rule, operating in the extant regulatory scheme, is to impact permitting requirements, thereby affecting the granting and denying of permits. This is enough, the Agencies argue, to bring the Clean Water Rule within the ambit of subsection (F), because it too impacts permitting requirements. In support they cite a Sixth Circuit case, *Nat'l Cotton Council v. U.S. E.P.A.*, 553 F.3d 927, 933 (6th Cir. 2009), *cert. denied sub nom. Crop Life v. Baykeeper*, 130 S.Ct. 1505 (2010), and *Am. Farm Bureau Fed'n v. Baykeeper*, 130 S.Ct. 1505 (2010). In *National Cotton*, this court held that subsection (F) authorizes direct circuit court review not only of actions issuing or denying particular permits, but also of regulations governing the issuance of permits. The court relied on authorities from the Ninth Circuit and D.C. Circuit stemming from *E.I. du Pont* and *Crown Simpson*. *See Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 966 F.2d 1292, 1296–97 (9th Cir. 1992); *Am. Mining Cong. v. U.S. E.P.A.*, 965 F.2d 759, 763 (9th Cir. 1992); *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 656 F.2d 768, 775 (D.C. Cir. 1981). In fact, the *National Cotton* court noted that this more expansive reading of subsection (F) encompassed even regulations that *exempted* certain discharges from permitting requirements. *Nat'l Cotton*, 553 F.3d at 933. That

is, under subsection (F), a regulation that imposes no restriction or limitation is reviewable in circuit court, so long as it affects permitting requirements.[5]

Movants maintain that a mere impact on permitting requirements is not enough to bring the Rule within subsection (F).  They contend the holding of *Crown Simpson*'s expansion of the plain language of the provision is really quite narrow and that *National Cotton*'s reading of subsection (F) is overly broad and even inconsistent with *Crown Simpson*.  They contend the "precise effect" of the Clean Water Rule is *not* to deny any permit and that it is therefore not "functionally similar."

Movants attack *National Cotton* on several fronts.  First, they contend the decision is not entitled to precedential weight because its determination of jurisdiction was summary in nature and devoid of substantive analysis.  In support they cite *Emswiler v. CSX Transportation, Inc.*, 691 F.3d 782, 788–90 (6th Cir. 2012), for the proposition that "drive-by jurisdictional rulings" based on "less than meticulous" reasoning should be accorded no precedential effect.  *Emswiler* is inapposite.  The *Emswiler* court used these characterizations in relation to an opinion's careless characterization of a party's failure to meet a threshold exhaustion requirement as depriving the court of subject matter jurisdiction.  While the failure to exhaust impacted the plaintiff's ability to win relief on the merits, the *Emswiler* court called it "less than meticulous" to say the failure to exhaust deprived the court of subject matter jurisdiction.  *Id.* at 789.  The *National Cotton* jurisdictional ruling was not the product of carelessness.  It is succinct because it efficiently follows the holdings of several other rulings—one by the Supreme Court—whose reasoning it implicitly incorporated by citing them.

Granted, the Eleventh Circuit expressly declined to follow *National Cotton* in *Friends of the Everglades*, 699 F.3d at 1288, rejecting the position that *Crown Simpson* legitimized direct circuit court review of any "regulations relating to permitting itself."  The court noted that, although the Sixth Circuit adopted that interpretation in *National Cotton*, it did so in reliance on two Ninth Circuit cases that had since been distinguished by the Ninth Circuit in *Northwest Environmental*, 537 F.3d at 1016–18.  In *Northwest Environmental*, 537 F.3d at 1018, as in

---

[5]*National Cotton* was followed in *this* litigation in *Murray Energy*, 2015 WL 5062506 at *5–6, the court noting there was no dispute that the Clean Water Rule will have an impact on permitting requirements.

*Friends of the Everglades*, 699 F.3d at 1288, the court ruled that a regulation creating a permanent exemption from the permitting process could not have the effect of granting or denying a permit reviewable under § 1369(b)(1)(F) precisely because the regulation *excluded* certain discharges from the permitting process altogether.

Yet, even if it be conceded that *National Cotton* said too much when it noted in *dicta* that the Ninth Circuit had construed subsection (F) broadly enough to include an exemption from regulation, the fact remains that the action here under review is not an exemption. Rather, both petitioners and the Agencies operate on the understanding that the effect of the Clean Water Rule is not solely to exclude waters from protection, but to extend protection to some additional waters. This extension indisputably expands regulatory authority and impacts the granting and denying of permits in fundamental ways. The later clarification of Ninth Circuit law noted in *Friends of the Everglades* does not, therefore, in any way undermine the authority of *National Cotton* as applied to the Clean Water Rule.

Finally, movants contend *National Cotton* is wrongly decided. They contend that *Crown Simpson*'s expanded construction of subsection (F) was narrow and circumscribed; whereas *National Cotton*'s holding that subsection (F) authorizes circuit court review of "regulations governing the issuance of permits" is unduly broad. Perhaps. Yet, if we believed *National Cotton* was not distinguishable and was wrongly decided, we would still not be free to reject its holding. Generally, in a multi-circuit case where a question of federal law is at issue, the transferee court is obliged to follow its own interpretation of the relevant law. *See Murphy v. FDIC*, 208 F.3d 959, 964–65 (11th Cir. 2000) (citing *In re Korean Airlines Disaster*, 829 F.2d 1171, 1175–76 (D.C. Cir. 1987), and observing that other circuits have uniformly agreed with the D.C. Circuit). Moreover, no other court has held that *National Cotton* was wrongly decided. *National Cotton*, as well as the Ninth Circuit and D.C. Circuit authorities on which it relied, are still good law. Movants have not identified any materially contrary authority.

Furthermore, *National Cotton*'s construction is consistent with congressional purpose, which appears to have been the guiding light in both *E.I. du Pont* and *Crown Simpson*. In *Florida Power*, 470 U.S. at 744–45, in relation to the Atomic Energy Act, the Court recognized that "one crucial purpose" of statutes providing for direct circuit court review of agency action is

judicial economy. *Id.* at 744. The Court noted that the district court's superior factfinding capacity is typically unnecessary to judicial review of agency action. On the other hand, providing for initial review in the district court has the negative effect of "requiring duplication of the identical task in the district court and in the court of appeals; both courts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Id.* The Court acknowledged that the intent of Congress, not the Court's concept of sound policy, is ultimately determinative, but concluded:

> Absent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals.

*Id.* at 746. *See also Tennessee v. Herrington*, 806 F.2d 642, 650 (6th Cir. 1986) (following *Florida Power* and noting that where Congress has provided for direct circuit court review but its intent is ambiguous in a specific case, policy considerations are relevant); *Natural Resources Def. Council v. Abraham*, 355 F.3d 179, 193 (2d Cir. 2004) (citing cases from Second, Seventh, Tenth and D.C. Circuits for the proposition that "when there *is* a specific statutory grant of jurisdiction to the court of appeals, it should be construed in favor of review by the court of appeals.").

*National Cotton*'s broader reading of subsection (F) is thus consistent with the preference in favor of circuit court review recognized in *Florida Power* and implicitly at work in both *E.I. du Pont*, *see* 430 U.S. at 128 (characterizing it as "almost inconceivable that Congress would have required duplicate review in the first instance by different courts"), and *Crown Simpson*, *see* 445 U.S. at 196–97 (noting unwillingness to conclude Congress intended to cause delays that would result from duplicative review process).

In *Florida Power*, the Court overruled Justice Stevens' objection that proper deference to Congress required enforcement of "the plain and simple construction of the statutory language." *Id.* at 750. Justice Stevens' plain-language position, like that of movants in this case, is not devoid of logic. Yet, as Justice Stevens protested, the Court rejected it as a matter of mere "semantic quibbles." *Id.* We do not view movants' plain-language arguments as semantic quibbles, but, in my view, they have clearly failed to identify any *substantial* reason to conclude

the preference favoring direct circuit court review—created by Congress in § 1369(b)(1) and honored by the Supreme Court—does not, in this case, ultimately serve all parties' interests in efficiency, judicial economy, clarity, uniformity and finality.

*Florida Power*, like *E.I. du Pont* and *Crown Simpson*, demonstrates a strong preference for construing Congress's provision for direct circuit court review of agency action by a practical, functional approach rather than a technical approach. A holding that we have jurisdiction to hear the instant petitions for review of the Clean Water Rule is consistent with this understanding. On the other hand, a contrary ruling, though facially consonant with the plain language of § 1369(b)(1), finds practically no solid support in the case law. Accordingly, I conclude that we have jurisdiction under subsection (F) as well.

## C.  Miscellaneous Objections

Movants present arguments based on other statutory provisions, items of legislative history and canons of construction. The arguments are not persuasive. That the Clean Water Rule was promulgated jointly by the EPA Administrator *and* the Secretary of the Army does not defeat the fact that it represents action, in substantial part, of the Administrator. The items of legislative history identified by the parties and said to be probative of congressional intent are sparse and frankly shed little light on the specific jurisdictional questions before the court. *See E.I. du Pont*, 430 U.S. at 133 (dismissing arguments based on other provisions of the statute and legislative history as inconclusive and not deserving of detailed discussion). Similarly, the various canons of construction alluded to by the parties are inconclusive and carry little weight in comparison with the dispositive considerations, as defined in the foregoing discussion of the guiding case law.

Movants also raise what they characterize as "due process concerns." They contend that if circuit court jurisdiction is exercised under § 1369(b)(1), then any other challenges to the Clean Water Rule not made within 120 days after its promulgation are foreclosed unless based on grounds which arose after the 120th day, per § 1369(b)(2). If subsequent as-applied challenges are thus deemed precluded, then unwary point-source operators and landowners uncertain about the scope of the Clean Water Act's regulatory reach may be subject to

enforcement actions and penalties without fair notice of the conduct prohibited. In *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992), the Ninth Circuit referred to this preclusive effect as a "peculiar sting."

The concern is speculative and overblown in this case. If the court exercises jurisdiction over petitioners' instant challenges to the validity of the Rule in this nationwide multi-circuit case and upholds the Rule, then that determination *should* have preclusive effect. *See Narragansett Elec. Co. v. U.S. E.P.A.*, 407 F.3d 1, 5 (1st Cir. 2005) (noting that "the short time frame in § 1369(b) clearly reflects some effort to protect the EPA's interests in finality in certain matters, particularly certain rulemakings with substantial significance and scope."). On the other hand, this court's exercise of jurisdiction and ruling on a challenge to the *validity* of the Rule would not preclude challenge to subsequent *application* of the Rule in a particular permitting requirement or enforcement action. *See Decker v. Nw. Envtl. Def. Ctr.*, 133 S.Ct. 1326, 1335 (2013) (noting that whereas a challenge to the validity of regulations would be subject to the exclusive jurisdictional bar of § 1369(b)(2), an enforcement action would not be). To the extent our eventual ruling on the validity of the Rule might conceivably be asserted in overbroad fashion as barring a defense against application of the Rule in an enforcement action, the asserted bar would be subject to testing as excessive and unfairly prejudicial in that action. *See Nat. Res. Def. Council v. U.S. E.P.A.*, 673 F.3d 400, 407 (D.C. Cir. 1982) (rejecting the same "due process" argument and suggesting that overbroad application of the § 1369(b)(2) bar could be challenged, when ripe, as unconstitutional). We therefore reject movants' "due process" concerns" as premature and unfounded.

### III. CONCLUSION

Both sides have presented worthy arguments in support of their respective positions on jurisdiction. Since enactment of the Clean Water Act in 1972, the jurisdictional provisions of § 1369(b)(1)(E) and (F) have been subjected to judicial scrutiny in relation to various regulatory actions and have been consistently construed not in a strict literal sense, but in a manner designed to further Congress's evident purposes. Pursuant to the uniform trend of the instructive case law, the scope of direct circuit court review has gradually expanded. In response, Congress has not moved to amend the provision or otherwise taken "corrective" action. As explained

above, the instant petitions for review of the Clean Water Rule come within the scope of subsections (E) and (F), as they have come to be defined in the governing case law. Movants have failed to identify any particular circumstances or practical considerations that would justify holding that adjudication of the instant petitions for judicial review in the various district courts would better serve Congress's purposes. Instead, recognition of our authority and our duty to directly review the Clean Water Rule in this multi-circuit case is in all respects consonant with the governing case law and in furtherance of Congress's purposes. Conversely, to rule that we lack jurisdiction would be to contravene prevailing case law and frustrate congressional purposes without substantial justification.

We hold that jurisdiction is properly laid in this court. All pending motions to dismiss are **DENIED**.

-----

## CONCURRING IN THE JUDGMENT

-----

GRIFFIN, Circuit Judge, concurring in the judgment, only.

I concur in the judgment holding that we possess subject-matter jurisdiction in this case; thus, I join in denying petitioners' motions to dismiss. However, I do so only because I am required to follow our precedentially-binding decision, *National Cotton Council of America v. U.S. E.P.A.*, 553 F.3d 927 (6th Cir. 2009). Were it not for *National Cotton*, I would grant the motions to dismiss.

## I.

Congress establishes the jurisdiction of the courts of appeals and other inferior courts. *See, e.g., Kontrick v. Ryan*, 540 U.S. 443, 452 (2004). In determining whether the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, creates jurisdiction in our court over a case or controversy, we must examine and apply the terms of the statute enacted by Congress. As with all matters of statutory construction, we should apply a textualist, not a "functional" or "formalistic," approach.[1]

In this regard, "[i]t is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485 (1917). "If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning." *Id.* at 490. Recognizing the consequences of unbridled judicial forays into the legislative sphere, the Supreme Court has admonished "'time and again that courts must presume that a legislature says

-----

[1]With a heavy heart, I acknowledge the sudden passing of Justice Antonin Scalia. Justice Scalia was the founder and champion of the modern textualist mode of constitutional and statutory construction. His essay, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW (1997), and other writings and opinions profoundly influenced a generation of attorneys, legal scholars, and judges. Justice Scalia's legacy will live on for decades in countless opinions such as this one.

in a statute what it means and means in a statute what it says there.'" *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy,* 548 U.S. 291, 296 (2006) (quoting *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54 (1992)). Accordingly, "[w]hen the statutory language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Id.* (internal citations and quotation marks omitted).

Whether it is desirable for us to possess jurisdiction for purposes of the efficient functioning of the judiciary, or for public policy purposes, is not the issue. Rather, the question is whether Congress in fact created jurisdiction in the courts of appeals for this case. I conclude that it did not.

The Environmental Protection Agency and the U.S. Army Corps of Engineers ("the Agencies") argue that both 33 U.S.C. § 1369(b)(1)(E) and (F) vest this court with jurisdiction regarding petitioners' claims. In my view, it is illogical and unreasonable to read the text of either subsection (E) or (F) as creating jurisdiction in the courts of appeals for these issues. Nonetheless, because *National Cotton* held otherwise with respect to subsection (F), I concur in the judgment, only.

## II.

Subsection (E) creates jurisdiction to review an action "approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title[.]" Sections 1311 and 1312 specifically set forth effluent limitations and water quality related-effluent limitations. Sections 1316 and 1345 provide additional limitations on discharges and sewage sludge to achieve state water quality standards when those in sections 1311 and 1312 fall short. The Act defines "effluent limitation" as expressly relating to *discharges*:

> The term "effluent limitation" means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are *discharged* from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

§ 1362(11) (emphasis added). It does not define "other limitation."

Petitioners ask that we draw an associational link between effluent and other limitations, directing this court to a Fourth Circuit case that speaks in terms of an "other limitation" being "closely related" to "effluent limitations," *Va. Elect. & Power Co. v. Costle*, 566 F.2d 446, 450 (4th Cir. 1977) ("*VEPCO*"), and to a Seventh Circuit case holding that "other limitation" is "restricted to limitations directly related to effluent limitations." *Am. Paper Inst., Inc. v. U.S. E.P.A.*, 890 F.2d 869, 877 (7th Cir. 1989). On the other hand, the Agencies advocate for—and the lead opinion applies—a broad reading of "other limitation"; that is, "other limitation" includes "restrictions that are *not* effluent limitations."

In my view, both are wrong. Whatever the relationship may be between effluent and other limitations, the plain text of subsection (E) clearly delineates what the limitations are, and what they are not: the "limitations" set forth in §§ 1311, 1312, 1316, and 1345 provide the boundaries for what constitutes an effluent or other limitation. The statutory interpretation canon, *noscitur a sociis*, drives this point home. Simply, "a word is known by the company it keeps" to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (citation omitted). Application of this canon is simple: "any effluent limitation or other limitation" must be related to the statutory boundaries set forth in §§ 1311, 1312, 1316, and 1345.

The problem with the boundaries for the Agencies is that the definitional section the Clean Water Rule modifies—"[t]he term 'navigable waters' means the waters of the United States, including the territorial seas"—does not emanate from these sections. It is a phrase used in the Act's definitional section, § 1362, and no more. But the definitional section is not mentioned in § 1369, let alone the specific sections listed in subsection (E). And the definitional section, as the lead opinion acknowledges, is not self-executing; at best, it operates in conjunction with other sections scattered throughout the Act to define when its restrictions even apply. Accordingly, the lack of any reference to § 1362 in subsection (E) counsels heavily against a finding of jurisdiction. *See Friends of Earth v. U.S. E.P.A.*, 333 F.3d 184, 189 (D.C. Cir. 2003) ("[T]he courts of appeals have consistently held that the express listing of specific EPA actions in section 1369(b)(1) precludes direct appellate review of those actions not so

specified."); *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992) ("It would be an odd use of language to say 'any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title' in § 1369(b)(1)(E) if the references to particular sections were not meant to exclude others.").

The Agencies' response to this textual point is underwhelming, raising suppositional and policy arguments. First, the Agencies contend that they promulgated the Clean Water Rule *only* under the *effluent limitations* provision codified at § 1311. Section 1311 makes the unauthorized "discharge of any pollutant by any person . . . unlawful." § 1311(a). The phrase "discharge of any pollutant" is defined, as pertinent here, as "any addition of any pollutant to navigable waters from any point source." § 1362(12)(A). The Agencies concede that "[t]he plain text reading of the phrase 'other limitation under sections 1311, 1312, 1316, or 1345' . . . *can only refer to limitations that are promulgated under the specified sections but are not effluent limitations*." (Emphasis added.) They then suppose in circular fashion that "[b]y defining what waters are 'waters of the United States,' the Clean Water Rule establishes where the Act's prohibitions and requirements apply."

This may be true, but it fails muster on the point of whether the Clean Water Rule is any "other limitation" within the meaning of § 1311. Importantly, neither the Agencies nor the lead opinion have identified a specified subsection within § 1311 that are "not effluent limitations" under which the Agencies promulgated the Clean Water Rule. This is because they cannot. Waters of the United States applies across the Act, not just to those discharge limitations set forth in § 1311. The Clean Water Rule is not a "limitation" on the discharge of pollutants *into* waters of the United States; rather, it sets the jurisdictional reach for whether the discharge limitations even apply in the first place. In the Agencies' own words:

> The action imposes no enforceable duty on any state, local, or tribal governments, or the private sector, and does not contain regulatory requirements that might significantly or uniquely affect small governments.

Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054, 37,102 (June 29, 2015) (to be codified at 33 C.F.R. pt. 328 and 40 C.F.R. pts. 110, 112, 116, 117, 122, 230, 232, 300, 302, and 401). In short, I refuse to read § 1369's narrow jurisdictional

authorization in such a circular fashion, expansively turning the broadening of the Act's jurisdiction into a limitation that may be imposed *only when jurisdiction is appropriate.  Cf. North Dakota v. U.S. E.P.A.*, --- F. Supp. 3d ---, 2015 WL 5060744, at *2 (D.N.D. Aug. 27, 2015) ("[T]he States have exactly the same discretion to dispose of pollutants into the waters of the United States after the Rule as before.").

Second, the Agencies raise policy considerations as to why review of such a nationally important rule should originate in the courts of appeals.  They argue, for example, that the definition of waters of the United States is a "fundamental" and "basic regulation" pertinent to the Act's backbone—its prohibition against discharging pollutants into such waters without a permit.  The Agencies also argue initial review in the district courts will inevitably lead to waste of judicial and party resources, delays, and possibly even different results.

However, no matter how important a policy prerogative may be, the Act's plain and unambiguous text binds this court.  That text stands in marked contrast to the Clean Air Act's express authorization to challenge "any other nationally applicable regulations" by the EPA in the D.C. Circuit.  *See* 42 U.S.C. § 7607(b)(1); *Am. Paper Inst.*, 890 F.2d at 877 ("Congress could easily have provided jurisdiction . . . by providing a general jurisdiction provision in the Act.  Instead, Congress specified those EPA activities that were directly reviewable by the court of appeals.") (internal citation omitted).  And that text makes clear that this court does not have jurisdiction to hear a challenge to a regulation that does not impose any limitation as set forth by the Act.

The lead opinion departs from the Act's plain text by relying on a string of cases it contends encourages a function-over-form approach to subsection (E).  *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977), we are told, broadly interprets the Act's jurisdictional authorization to prevent the "truly perverse situation" where the courts of appeals review actions issuing or denying permits, but not the "basic regulations governing those individual actions."  I agree that *E.I. du Pont* speaks to such policy considerations, but disagree that such policy considerations drove the Court's analysis.

In *E.I. du Pont*, the Supreme Court considered effluent limitation regulations promulgated by the EPA for discharges by the inorganic chemical industry. *Id.* at 122–24. The primary issue was whether the Act granted the EPA the power to set effluent limitations by regulation (thereby falling within subsection (E)) or by guideline (thereby falling outside subsection (E)). *Id.* at 124–25. "Thus the issue of jurisdiction to review the regulations [was] intertwined with the issue of [the] EPA's power to issue the regulations." *Id.* at 125. After resolving the "critical question [of] whether [the] EPA has the power to issue effluent limitations by regulation" in the EPA's favor based on the statute's text and legislative history, *id.* at 124, 126–36, the Court plainly noted that its holding that the Act "authorize[d] the [EPA] to promulgate effluent limitations [by regulation] for classes and categories of existing point sources *necessarily resolve[d] the jurisdictional issue* as well." *Id.* at 136 (emphasis added).

Yet, the lead opinion draws its "functional" "lens" from *E.I. du Pont*'s subsequent discussion as to why it rejected the industry's argument that subsection (E)'s reference to § 1311 (the effluent limitations provision) "was intended only to provide for review of the grant or denial of an individual variance" from the Act's effluent limitations restriction. *Id.* Among other reasons, the Court found this argument unpersuasive because the industry's "construction would produce the truly perverse situation in which the court of appeals would review numerous individual actions issuing or denying permits . . . but would have no power of direct review of the basic regulations governing those individual actions." *Id.* This policy reason came *after* a plain textual rejection of the industry's position. *Id.* It is, therefore, a far stretch to take this dicta and expand it as the lead opinion does to find jurisdiction proper when a regulation's "practical effect" only sets forth "indirect" limits. And, unlike in *E.I du Pont*, the Agencies here admit they have not promulgated an effluent limitation. I therefore decline to read *E.I. du Pont*, as the lead opinion does, as shoehorning an exercise in jurisdictional line-drawing into subsection (E)'s "other limitation" provision.

To the extent policy considerations are responsible for *E.I. du Pont*'s outcome, I disagree that, to borrow the lead opinion's phrase, such "real world" considerations mandate a watered-down version of textualism in this case, erroneously elevating the perceived congressional purpose over the statutory language. As the Supreme Court emphasized just last year, "[o]ur job

is to follow the text even if doing so will supposedly 'undercut a basic objective of the statute.'" *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015) (citation omitted).  Thus, when presented with "the clear meaning of the text, there is no need to . . . consult the [statute's] purpose. . . . [I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167–68 (2004) (citation omitted and second alteration in original).  Put differently, unambiguous text trumps policy considerations.  *See Kloeckner v. Solis*, 133 S. Ct. 596, 607 n.4 (2012) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text."); *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1710 (2012) ("[N]o legislation pursues its purposes at all costs, and petitioners' purposive argument simply cannot overcome the force of the plain text.") (internal citation omitted); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993) ("[V]ague notions of a statute's 'basic purpose' are nonetheless inadequate to overcome the words of its text regarding the *specific* issue under consideration.").  As set forth, subsection (E)'s language could not be clearer, thus removing policy considerations from this court's analytical quiver.

Circuit case law drawing on this "functional approach" similarly misses the mark. Notably, *VEPCO* appears to define "limitation" as "a restriction on the untrammeled discretion of the industry which was the condition prior to the [Act's] passage."  566 F.2d at 450.  Other cases relied upon by the lead opinion have followed this analysis.  *See, e.g., Iowa League of Cities v. U.S. E.P.A.*, 711 F.3d 844, 866 (8th Cir. 2013); *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 673 F.2d 400, 405 (D.C. Cir. 1982) ("*NRDC II*").  However, *VEPCO*'s statement requires context.

The regulation at issue in *VEPCO* governed the "structures used to withdraw water for cooling purposes."  566 F.2d at 446–51.  It did "not impose specific structural or locational requirements upon cooling water intake structures," and instead just "require[d] that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact."  *Id.* at 450.  Because the regulation mandated the consideration of certain information in constructing intake structures, the Fourth Circuit reasoned, that "in itself [was] a limitation on point sources and permit issuers" and

therefore restricted "the untrammeled discretion of the industry." *VEPCO* also drew from *E.I. du Pont*, reasoning that the regulation issued there was "so closely related to the effluent limitations and new source standards of performance . . . that . . . it would be anomalous to have their review bifurcated between different courts." *Id.* (*citing E.I. du Pont*, 430 U.S. at 136).

At most, *VEPCO* is an example of what constitutes an "other limitation"—a restriction on the industry's abilities to intrude upon the waters of the United States without the Agencies' permission to do so. In this regard, the Fourth Circuit's "untrammeled discretion" language makes absolute sense, but I disagree with the lead opinion's reliance upon this language here. The *Act* in and of itself restricts the industry's untrammeled discretion. I see no textual indication that Congress intended *any* restriction on the industry to be directly reviewed by the courts of appeals, yet under the lead opinion's reading, *any* industry restriction requires review here. The lead opinion's application thus swallows the rule.

Finally, that the Clean Water Rule arguably expands the Act's jurisdiction cannot be a reason to find a functional limitation under subsection (E). The lead opinion hangs its "functional" premise on the fact that the Clean Water Rule is a "basic regulation" affecting the Act's core, defining where it applies and where it does not. It presumes, perhaps rightly so, that the Clean Water Rule "results in [an] expansion of regulatory authority in some instances and impos[es] . . . additional restrictions on the activities of some property owners." However, I cannot agree that the latter supports the former in concluding that the Clean Water Rule "has the *indirect* effect of altering permit issuers' authority to restrict point-source operators' discharges into covered waters." A plausible hypothetical removes the linchpin in this analysis. Suppose instead of taking a flow-like approach to the Act's jurisdiction, the Agencies—perhaps under a different administration—promulgate a rule that ebbs toward a more restricted view, consistent with the plurality opinion in *Rapanos v. United States*, 547 U.S. 715 (2006). Under the lead opinion's analysis, a rule *narrowing* the scope of the waters of the United States would *also* be an "other limitation" sufficient to trigger our jurisdiction because it too would indirectly affect point-source operators and permit issuing authorities, albeit in a less restrictive manner. Congress could not have intended such a nonsensical result.

For these reasons, I cannot conclude that subsection (E) authorizes our jurisdiction.

III.

Second, the lead opinion concludes we have jurisdiction to hear petitioners' challenges under subsection (F). I agree, but for different reasons. Specifically, while I agree that *National Cotton* controls this court's conclusion, I disagree that it was correctly decided. But for *National Cotton*, I would find jurisdiction lacking. I therefore concur in the judgment, only.

Section 1369(b)(1)(F) provides exclusive jurisdiction in this court to review an action "issuing or denying any permit under section 1342, [the National Pollutant Discharge Elimination System ("NPDES")]." On its face, subsection (F) clearly does not apply to the Clean Water Rule's promulgation. *See Rhode Island v. U.S. E.P.A.*, 378 F.3d 19, 23 (1st Cir. 2004) ("By its plain terms, [subsection (F)] conditions the availability of judicial review on the issuance or denial of a permit."). Under a plain text reading, the Clean Water Rule neither issues nor denies a permit under the NPDES. In my view, this should end the analysis. I am, however, constrained by our court's precedent holding that "issuing or denying any permit" means more than just that.

As the lead opinion correctly notes, several courts have deviated from a strict reading of the jurisdictional language and toward a more "functional" approach. In *Crown Simpson Pulp Company v. Costle*, for example, the Supreme Court blessed jurisdiction in the courts of appeals when the EPA's action—there, vetoing California's proposal to grant permits for pulp mills to discharge pollutants into the Pacific Ocean—had the "precise effect" of denying a permit. 445 U.S. 193, 196 (1980). In other words, jurisdiction was proper because the EPA's action was "functionally similar to its denial of a permit in States which do not administer an approved permit-issuing program." *Id.* A contrary ruling, held the Supreme Court, would lead to an "irrational bifurcated system" depending upon "the fortuitous circumstance of whether the State in which the case arose was or was not authorized to issue permits." *Id.* at 196–97. Both the D.C. Circuit, *Nat. Res. Def. Council, Inc. v. U.S. E.P.A*, 656 F.2d 768, 776 (D.C. Cir. 1981) ("*NRDC I*"); *NRDC II*, 673 F.2d at 405 (then-Judge Ginsburg's "practical rather than a cramped construction" counsel), and the Ninth Circuit, *Am. Mining Congress v. U.S. E.P.A.*, 965 F.2d 759 (9th Cir. 1992), *Nat. Res. Def. Council, Inc., v. U.S. E.P.A.*, 966 F.2d 1292, 1297 (9th Cir. 1992)

("*NRDC III*"), *Nat. Res. Def. Council v. U.S. E.P.A.*, 526 F.3d 591, 601 (9th Cir. 2008) ("*NRDC IV*"), have similarly adopted a functional approach to jurisdiction under subsection (F).

I depart ways with the lead opinion at the breadth with which it reads *Crown Simpson*. As the Ninth Circuit made clear in *Northwest Environmental Advocates v. U.S. E.P.A.*, "[t]he facts of [*Crown Simpson*] make clear that the Court understood functional similarity in a narrow sense." 537 F.3d 1006, 1016 (9th Cir. 2008). The Supreme Court was clearly concerned with a rigid construction of "issuing or denying" given the factual circumstances of *Crown Simpson*— *i.e.*, had the EPA not delegated California the authority to designate NPDES permits, it would have had the power to grant or deny permits directly (thus explaining the "perverse" result rationale). With this factual overlay, the Court's "precise effect" exception makes sense.

That exception simply does not apply here. We have underscored that the text matters when interpreting the jurisdictional grant of § 1369(b)(1). *See Lake Cumberland Trust, Inc. v. U.S. E.P.A.*, 954 F.2d 1218, 1221–24 (6th Cir. 1992) (noting the textual distinctions between subsections (E) and (G) to find no jurisdiction). It is also not lost on me that *National Cotton* itself purported to accentuate § 1369(b)(1)'s narrowness. 553 F.3d at 933 ("Congress did not intend court of appeals jurisdiction over all EPA actions taken pursuant to the Act."). It stretches the plain text of subsection (F) to its breaking point to hold that a definition setting the Act's boundaries has, under *Crown Simpson*, the "precise effect" of or is "functionally similar" to, approving or denying a NPDES permit. At best, the Clean Water Rule is one step removed from the permitting process. It informs whether the Act requires a permit in the first place, not whether the Agencies can (or will) issue or deny a permit.

Two other points buttress my problem with jurisdiction here. First, the Clean Water Rule applies across the entire Act, and not just with respect to the NPDES permitting process. This is particularly true when considering the fact that the Clean Water Rule's expansive definition also applies to the provision of the Act—§ 1344—requiring the Corps to issue permits for dredged or fill material. Section 1344, however, is not mentioned in subsection (F), only § 1342 is. Second, the Agencies' own argument as to why they contend the Clean Water Rule constitutes "issuing or denying any permit" shows why there are problems with extending jurisdiction to cover the Clean Water Rule. By suggesting that the Clean Water Rule identifies what waters will and will

not require permitting under NPDES, they have therefore identified situations—*i.e.*, not waters of the United States—where there would never be permit decisions in the first place to be reviewed by the courts of appeals. *See Nw. Envtl. Advocates*, 537 F.3d at 1018; *Friends of the Everglades*, 699 F.3d at 1288.

Although not bound by *Crown Simpson* and the other cases cited by the lead opinion, *National Cotton* dictates my conclusion. There, we extended jurisdiction under subsection (F) when a rule "regulates the permitting procedures." 553 F.3d at 933. At issue in *National Cotton* was an EPA rule exempting certain pesticides from the NPDES permitting requirements. *Id.* at 929. In expanding subsection (F)'s jurisdictional authorization, our court relied upon statements by the Ninth Circuit in *American Mining Congress* and *NRDC III* extending jurisdictional review from the "issuance or denial of a particular permit" to "the regulations governing the issuance of permits" and the "rules that regulate the underlying permit procedures." *Id.* at 933 (citations omitted).

*National Cotton*'s jurisdictional reach, in my view, has no end. Indeed, the lead opinion even acknowledges that *National Cotton* holds "a regulation that imposes no restriction or limitation is reviewable in circuit court, so long as it affects permitting requirements." It is a broad authorization to the courts of appeals to review *anything* relating to permitting notwithstanding the statutory language to the contrary.

Moreover, the Ninth Circuit has subsequently rolled back the two cases relied upon by *National Cotton* to broadly interpret subsection (F), *American Mining Congress* and *NRDC III*. *See Nw. Envtl. Advocates*, 537 F.3d at 1018. It also drew a line between statutory exemptions and permitting procedures, noting that a regulation granting a statutory exemption necessarily meant that the courts of appeals would "never have to consider on direct review an action involving the denial of an NPDES permit for pollutant discharges" and thus there was no danger of the "awkward[]" and bifurcated review problem described in *NRDC I*. *Id.* at 1018 (citation omitted). The Eleventh Circuit, sitting *en banc*, has also taken this tack. *See Friends of the Everglades*, 699 F.3d at 1288. It also directly criticized *National Cotton* for expanding subsection (F) to apply to any "regulations relating to permitting itself." *Id.*

The lead opinion distinguishes *Northwest Environmental Advocates* and *Friends of the Everglades*, noting that those cases addressed permitting *exemptions*. But so too did *National Cotton*. In my view, the Ninth and Eleventh Circuit's commentary regarding *National Cotton* and its undergirdings have merit, especially considering subsection (F)'s plain text and the factually narrow circumstances of *Crown Simpson* and *E.I. du Pont*. These same reasons lead me to conclude the lead opinion's reliance on a non-Clean Water Act case to support its policy arguments, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985), is unavailing.

Taking *National Cotton*'s holding, as I must, there is a better way to reconcile these authorities: Permitting decisions under NPDES and exempting a certain action from the NPDES permitting process are functionally the same because both allow persons to discharge pollutants into the waters of the United States. Such actions, therefore, are reviewable under subsection (F). That is not what we have here. The Clean Water Rule presents neither a permitting exemption (*National Cotton*) nor similar functional equivalency (*Crown Simpson*) that any court has approved to find jurisdiction proper under subsection (F).

However, *National Cotton* goes further than just finding jurisdiction in cases involving permitting exemptions, and expands jurisdiction to review any regulation "governing" permits. 553 F.3d at 933. Although, in my view, the holding in *National Cotton* is incorrect, this panel is without authority to overrule it. *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1095 (6th Cir. 2010) ("It is a well-established rule in this Circuit that a panel of this court may not overrule a prior published opinion of our court absent en banc review or an intervening and binding change in the state of the law.").[2] Here, the Clean Water Rule defines what waters necessarily require permits, and therefore is undoubtedly a "regulation[] governing the issuance of permits under section 402 [33 U.S.C. § 1342]." *National Cotton*, 553 F.3d at 933. Under this binding authority, the lead opinion properly concludes jurisdiction rests before us under subsection (F).

For these reasons, I concur in the judgment, only.

---

[2]That this action is before us upon consolidation by the Judicial Panel on Multidistrict Litigation does not change this result, for we are to apply our law absent an indication that it is "unique" and "arguably divergent from the predominant interpretation of . . . federal law." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 n.17 (6th Cir. 2003). Although I disagree with *National Cotton*, I cannot conclude that it is unique and diverges from the predominant view of the other circuits.

IV.

In sum, I am compelled to find jurisdiction is proper pursuant to *National Cotton*. Absent *National Cotton*, I would dismiss the petitions for lack of jurisdiction.

---

## DISSENT

---

KEITH, Circuit Judge, dissenting.  I agree with Judge Griffin's reasoning and conclusion that, under the plain meaning of the statute, neither subsection (E) nor subsection (F) of 33 U.S.C § 1369(b)(1) confers original jurisdiction on the appellate courts.  Like Judge Griffin, I disagree with Judge McKeague.  Nevertheless, Judge Griffin concludes that original jurisdiction lies in the appellate courts under this court's opinion in *National Cotton Council of Am. v. U.S. EPA*, 553 F.3d 927 (6th Cir. 2009).  I believe Judge Griffin's reading of that case is wrong.

In *National Cotton*, this court concluded that it had original jurisdiction to review a rule that created exemptions to the permitting procedures of the Clean Water Act (the "Act"). 553 F.3d at 933.  In holding that jurisdiction was proper, the court reasoned that "[t]he jurisdictional grant of [subsection (F)] authorizes the court of appeals 'to review the regulations governing the issuance of permits . . . as well as the issuance or denial of a particular permit.'" *Id.* at 933 (quoting *Am. Mining Cong. v. U.S. EPA*, 965 F.2d 759, 763 (9th Cir. 1992)). Therefore, the court expanded subsection (F) to cover rules that "regulate[] the permitting procedures."  *See id.*; *cf.* 33 U.S.C. § 1369(b)(1)(F) (relating to administrative actions that "issu[e] or deny[] any permit under section 1342").  I view this limited expansion of subsection (F) as the holding of *National Cotton*.

By contrast, Judge Griffin contends that *National Cotton*'s holding expanded the scope of subsection (F) to include anything "relating" to permitting procedures.  While *National Cotton* expanded the scope of subsection (F) to cover rules "*regulating*" or "*governing*" permitting procedures, 553 F.3d at 933, it did not expand that subsection to cover all rules "*relating*" to those procedures, such as the one at issue here—a rule that merely defines the scope of the term "waters of the United States."  That a rule "relates" to a permitting procedure does not mean that it "regulates" or "governs" that procedure.  Therein lies the analytical fallacy in the concurrence. Simply put, it cannot be that any rule that merely "relates" to permitting procedures—however tenuous, minimal, or tangential that relation may be—confers original jurisdiction upon this

court under subsection (F). This could not have been the intent of the legislators who drafted seven carefully defined bases for original jurisdiction in the appellate courts—and it could not have been the intent of the *National Cotton* court itself.

Admittedly, the *National Cotton* court could have provided an explanation of what it meant by "regulations governing the issuance of permits." *See* 553 F.3d at 933. By not explaining this phrase, it invited much speculation about the scope of subsection (F). For example, the Eleventh Circuit in *Friends of the Everglades v. EPA*, 699 F.3d 1280, 1288 (11th Cir. 2012), declined to extend the rationale and holding of *National Cotton* because this court failed to provide a better explanation of its reasoning. However, *National Cotton*'s failure to define this phrase does not mean that this phrase must encompass everything. I am reluctant to read *National Cotton* in a way that expands the jurisdictional reach of subsection (F) in an all-encompassing, limitless fashion.

In sum, *National Cotton*'s holding is not as elastic as the concurrence suggests. If this court construes that holding to be so broad as to cover the facts of this case, that construction brings subsection (F) to its breaking point: a foreseeable consequence of the concurrence's reasoning is that this court would exercise original subject-matter jurisdiction over all things related to the Clean Water Act. Accordingly, I respectfully dissent.